**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

---

**Joseph Anthony Reyna,**

*Petitioner,*

v.

**Universal Music Group N.V.,**

*Respondent.*



---

**CIVIL ACTION NO. 25 CV 6779**

---

**RULE 27 PETITION FOR PRE-SUIT DISCOVERY AND PRESERVATION RELIEF**

**Pursuant to Fed. R. Civ. P. 27(a)(1)**

---

## I. INTRODUCTION

Petitioner **Joseph Anthony Reyna** ("Petitioner"), a federally documented whistleblower,

nonprofit director, and registered trademark holder (JOECAT®, USPTO Reg. No. 6,057,783),

respectfully petitions this Court under **Rule 27(a)(1)** of the Federal Rules of Civil Procedure for

limited, pre-suit discovery in anticipation of litigation against **Universal Music Group N.V.** ("UMG").

This Petition seeks the preservation of ingestion logs, metadata, audit trails, and chain-of-title records—data that is highly susceptible to automated deletion, corporate obfuscation, or institutional neglect.

Venue is proper under **28 U.S.C. § 1391(b)**, as UMG conducts catalog monetization, distribution licensing, and revenue-generating operations within this District.

Petitioner has issued **formal pre-litigation notice** to UMG Legal (June 16, 2025) describing metadata fraud, AI-linked suppression, and constructive trust violations. No response was received.

---

## II. PETITIONER'S STANDING

Petitioner is:

- A **federally documented whistleblower** (SEC, DOJ, IRS, FinCEN, USPS OIG);

- A **registered nonprofit director** (*Dreams Over Dollars™, EIN: 88-2187078*);

- A **USPTO-registered trademark holder** and published creator whose authorship has been digitally suppressed;

- A **low-income, ADA-protected pro se litigant** (SNAP/Pell Grant-qualified);

- A **verified initiator of formal filings and FOIA requests** across jurisdictions, now met with administrative silence.

## III. PURPOSE OF THIS PETITION

To prevent **irretrievable loss** of evidence relevant to:

- Authorship metadata alterations in UMG-affiliated uploads;

- Royalty suppression via bot fraud and algorithmic inflation;

- Constructive trust breaches in catalog acquisitions;

- Platform and vendor metadata laundering across shell entities;

- Systemic discrimination and cultural erasure masked by digital opacity.

## IV. LEGAL STANDARD

This Petition is brought under **Fed. R. Civ. P. 27(a)(1)**, which permits limited pre-suit discovery to preserve testimony or documentation that may be lost prior to litigation. See *Petition of Gurnsey*, 223 F. Supp. 359 (S.D.N.Y. 1963); *Zubulake v. UBS Warburg*, 220 F.R.D. 212 (S.D.N.Y. 2003).

In **In re Petition of Lyle**, 2022 WL 1655279 (S.D.N.Y. May 24, 2022), the Court granted pre-suit preservation under Rule 27 where digital records faced algorithmic deletion, finding metadata "an essential factual substrate subject to spoliation risks beyond petitioner's control."

Petitioner further invokes:

- **Restatement (Third) of Restitution §§ 51, 55** (constructive trust);

- **Fraud by omission** (*Lingsch v. Savage*, 213 Cal.App.2d 729 (1963));

- **Berne Convention / UDHR Article 27** (moral rights and authorship);

- **Texas Property Code § 111.003** (trust formation standards).

While the Berne Convention and UDHR Article 27 are not self-executing, their principles are enforceable through domestic proxies such as the **Lanham Act (15 U.S.C. § 1125)**, **civil rights statutes (42 U.S.C. § 1981)**, and **international licensing practices codified in U.S. copyright case law**. This Court may exercise jurisdiction under the **Charming Betsy doctrine**, construing U.S. statutes to align with treaty obligations where possible.

---

## A. FOIA Exhaustion Confirms Governmental Inaction

Petitioner has submitted more than **thirty-five (35)** FOIA requests across multiple federal agencies, including but not limited to the **Securities and Exchange Commission (SEC), Department of Justice (DOJ), United States Agency for Global Media (USAGM), Financial**

**Crimes Enforcement Network (FinCEN),** and the **Copyright Royalty Board (CRB)**. These requests sought records related to:

- **Royalty attribution audits**

- **Metadata standards enforcement**

- **Algorithmic playlist manipulation**

- **Label-DSP contractual agreements**

- **Royalty suppression via AI or ghost content**

To date, responses include:

- "No records" determinations;

- **Glomar denials** (refusal to confirm or deny existence of records); and

- **Procedural evasions** such as improper referrals, misdirected jurisdictional claims, or prolonged non-response.

This administrative silence constitutes **de facto acknowledgment** of a regulatory vacuum—confirming that **no federal mechanism currently enforces metadata integrity, digital rights transparency, or fair-market royalty attribution.**

This pattern now extends to **state judiciary**: In **June 2025**, Petitioner submitted a formal petition to the **Bexar County District Court** naming **Universal Music Group (UMG)** and affiliated

parties. Despite proper procedural filing, notarization, and certified mailing confirmation, the court issued:

- **No docket number**

- **No ruling**

- **No rejection**

This total lack of response constitutes **judicial nullification by silence** and evidences a broader trend of **institutional avoidance** surrounding catalog-based fraud and corporate music metadata accountability.

--------------------------------------------------------------------------------

**B. Pre-Litigation Notice to UMG (June 2025)**

On **June 16, 2025**, Petitioner issued **formal legal notice** to **Universal Music Group's Legal Department**, outlining the following allegations:

- **Metadata suppression** impacting royalty lineage and author credit;

- **AI-linked revenue redirection** violating equitable royalty attribution;

- **Constructive trust breaches** through unremitted digital revenue;

- **Reputational erasure** by DSP-algorithm suppression and misclassification.

This notice proposed a **non-NDA resolution pathway** and offered direct dialogue.

UMG has failed to respond.

This silence:

- Satisfies **pre-litigation notice requirements** under multiple jurisdictions;

- Demonstrates **willful indifference** to injunctive relief options; and

- Supports **punitive multiplier eligibility** for post-litigation damages under bad faith conduct standards.

---

## C. CRB Royalty Rate Silence (2024–2025)

The **Copyright Royalty Board (CRB)**, tasked with establishing statutory streaming royalty rates, is currently preparing the transition from **Web IV to Web V** rates (effective **January 1, 2026**).

Despite ample public evidence of:

- **AI inflation of catalog value**

- **DSP-driven metadata obfuscation**

- **Royalty redirection schemes impacting authorship and estate payments**

The CRB has **not issued any public statements, hearings, or requests for comment** on:

- Algorithmic attribution fairness;

- AI-generated content impact; or

- Label-DSP structural conflicts.

Without metadata integrity enforcement during this recalibration, **post-Web IV payouts become untraceable,** allowing fraud to become **both retroactively unrecoverable and prospectively immunized.**

---

**D. Conflict of Interest and Constructive Refusal by UMG's Counsel (Sidley Austin LLP)**

On **December 4, 2024,** Petitioner submitted a **pro bono representation request** to **Sidley Austin LLP,** including:

- Evidence of systemic royalty fraud;

- A partially drafted federal complaint against UMG and affiliated DSPs;

- Supporting documentation establishing pattern-based harm.

Sidley Austin **never responded**, despite actively representing **Universal Music Group** at the time of submission. Petitioner was **not informed of any conflict of interest,** nor was the request acknowledged.

This silence, in context, constitutes a **constructive refusal** and reinforces the following:

- **UMG had imputed knowledge** of claims through its counsel;

- Counsel had **confidential insider access** to relevant licensing, algorithm, and royalty metadata;

- Ethical breach risks exist under:

  - **ABA Model Rule 1.7** (Concurrent conflict of interest),

  - **Rule 1.9** (Duties to former prospective clients), and

  - **Rule 1.18** (Duties to prospective clients with material submissions).

This supports additional requests for:

- **Equitable tolling**, given obstructed access to legal redress;

- **Metadata preservation injunctions**, based on demonstrated constructive awareness;

- **Sanctions or disqualification motions**, should conflict-linked suppression continue.

## VI. PATTERN OF FRAUDULENT CATALOG DEVALUATION

UMG and/or its affiliates have:

- Enabled **bot streaming** to inflate valuations while undervaluing independent creators;

- Used **metadata overrides** to erase authorship and redirect royalties;

- Laundered catalog rights via shell distributors and DSP proxies;

- Created a **closed loop of acquisition and suppression**, artificially depressing payout floors while maximizing internal licensing gain.

This is **algorithmic arbitrage**: metadata fraud monetized as catalog opportunity.

## VII. SCOPE OF REQUESTED DISCOVERY

Petitioner requests:

1. **Preservation and eventual production** of ingestion logs and metadata override records;

2. **Internal UMG communications** involving ISRC reassignment, shell licensing, and price modeling;

3. **Chain-of-title records** for affected sound recordings;

4. **Royalty share documents** with Repost Network, Kobalt, SoundExchange, and related vendors;

5. **AI valuation reports** or internal justifications used in catalog acquisitions.

## VIII. EQUITABLE BASIS FOR RELIEF

- Constructive Trust Remedy under Restatement (Third) of Restitution § 51 — specifically, **a Court-supervised restitution model** if Respondent is found liable or if metadata-linked royalties are proven to have been misattributed. Relief may include **escrowed allocation** or redistribution of unjust gains pending final adjudication or corrective ingestion.

- **Unjust Enrichment**: Petitioner's authorship has been commercially exploited without attribution or revenue;

- **Fraud by Omission**: Silence where duty to clarify existed (metadata, authorship, attribution);

- **ADA Retaliation and Suppression**: Petitioner's cognitive access and platform rights were algorithmically restricted due to metadata misrouting.

## IX. REMEDY SOUGHT

Petitioner respectfully requests that this Court:

- **GRANT leave under Rule 27(a)(1)** for pre-suit discovery;

- **AUTHORIZE subpoenas and preservation orders** targeting ingestion logs, licensing metadata, and internal valuation records;

- **ORDER Rule 30(b)(6) depositions** to identify ingestion leads and suppression mechanisms within UMG;

- **ACKNOWLEDGE institutional silence** from UMG, the CRB, SEC, DOJ, and Bexar County as supporting urgency;

- **PERMIT supplementation** of discovery targets as further metadata-linked suppression is identified.

---

## X. SYSTEMIC RACIAL EXPLOITATION AND CIVIL RIGHTS IMPLICATIONS

Petitioner incorporates by reference the contents of **Exhibit K – Major Labels' Exploitation Patterns.xlsx**, which reveals a racially patterned monetization structure across major labels, including UMG.

Over **90% of trauma-linked, charted works** (e.g., "Hot N***a," "Slippin'," "Racks in the Middle") were released by Black artists during periods of vulnerability (incarceration, addiction, legal strife), with family burdens documented as:

- **$13,607** average debt for legal fees;

- **$600–$1,200/year** for phone calls;

- **$2,400/year** for commissary.

While artists are penalized and families indebted, **UMG and affiliates profit** through platform licensing and exploitative promotion.

This pattern supports:

- **42 U.S.C. § 1981** – Racial discrimination in contracting;

- **UCC § 2-302** – Unconscionable contracts;

- **Common law unjust enrichment** – Labels profit, while artists' families shoulder systemic harm.

Discovery is essential to obtain contracts, marketing strategies, and internal communications necessary to substantiate these civil rights violations.

---

## XI. CONCLUSION

Petitioner does not seek media attention or abstract relief. This is not a performance—it is preservation. The data is real, the silence is strategic, and the deletion is underway.

Petitioner has been **denied amicus standing** in every related filing—*Durst v. UMG, Graham v. UMG, People v. Daystar Peterson*, and others—despite legally grounded briefs and evidentiary attachments. Every agency has been notified. Every court has refused to acknowledge.

**This Petition ensures that what remains is not erased before it can be proven.**

---

## XII. PUBLIC INTEREST AND JUDICIAL ECONOMY

Granting this Petition serves the public interest by preventing the irreversible loss of authorship metadata, ensuring whistleblower safety, and reducing future litigation. The requested relief enables the Court to secure evidence prior to spoliation, clarify factual conflicts efficiently, and safeguard the structural integrity of royalty and attribution frameworks affecting thousands of independent creators. Petitioner does not seek premature adjudication, but narrowly tailored preservation and procedural oversight.

**Respectfully submitted,**

**Dated:** August 7, 2025

/s/ Joseph Anthony Reyna

**Joseph Anthony Reyna (aka JoeCat®)**

Pro Se Petitioner

Director, *Dreams Over Dollars*™ (501(c)(3), EIN: 88-2187078)

Registered Whistleblower | ADA-Protected Litigant

5900 Balcones Dr #16077

Austin, TX 78731

Email: whitehat@joecattt.com

Phone: [REDACTED FOR PUBLIC FILING]

# EXHIBIT INDEX

*In Support of Petition for Pre-Suit Discovery Pursuant to Rule 27(a)(1)*

**Petitioner: Joseph Anthony Reyna**

---

## I. Exhibits Filed Herewith

| Exhibit | Title | Purpose |
|---------|-------|---------|
| I | University of Houston x Universal Production Music Blanket License Agreement | Demonstrates ingestion-based metadata laundering through institutional licensing. Supports systemic misconduct by UMG and affiliated DSPs. |
| II | "Payola by Design" Report | Legal and technical analysis of Discovery Mode, algorithmic throttling, and incentive structures. Supports civil RICO predicates and deceptive trade practices. |
| AB | Settlement Offer to UMG (June 16, 2025) | Documents Petitioner's good-faith pre-litigation offer. Supports constructive refusal, bad-faith inference, and mitigation theory. |
| AD | Legal-Historical Report: Artist Rights and Metadata Suppression | Establishes 100-year systemic pattern of royalty theft, authorship erasure, and metadata fraud—connecting historical artist suppression (e.g., Bessie Smith) to modern-day catalog concealment and AI misattribution. |

15

| AE | Email to Sidley Austin LLP Requesting Pro Bono Representation While Counsel to UMG | Demonstrates that Petitioner placed UMG's legal counsel on direct notice of systemic fraud and related claims. Supports imputed knowledge, ethical conflict, and evidentiary preservation under Rule 27. |
|---|---|---|

## II. Exhibits Reserved for Future Filing

*To be submitted upon judicial request, motion, or discovery authorization*

| Exhibit | Title | Purpose |
|---|---|---|
| A | June 16, 2025 Notice to UMG Legal | Formal pre-litigation notice. Supports willfulness, constructive trust, and metadata concealment claims. |
| C | FOIA Denials (SEC, DOJ, USAGM, FinCEN) | Demonstrates exhaustion of administrative remedies. Establishes agency silence pattern. |
| D | Catalog Valuation Model & Suppression Timeline | Timeline of suppression and monetization. Frames valuation impact of metadata erasure. |
| E | Metadata Audit Examples (Petitioner's Works) | Platform records and screenshots proving disambiguation, third-party attribution, and DMCA §1202(b) violations. |

| H | Dreams Over Dollars™ Trust Infrastructure Overview | Validates readiness of constructive trust mechanism under equitable restitution. |
|---|---|---|
| K | Major Labels' Exploitation Patterns (.xlsx) | Quantitative evidence of racialized monetization and systemic pattern supporting §1981 and Lanham Act arguments. |
| L | Bexar County Filing Record and Institutional Silence | Demonstrates state-level exhaustion and judicial avoidance. |
| AA | Memorandum of Pattern-Based Denials and Agency Inaction | Compiles denials, omissions, and systemic evasion across courts and agencies. |
| X | Music Xray Submission Fraud Evidence | Screenshots and receipts documenting deceptive pay-for-placement practices targeting independent artists. Supports wire fraud theory and pattern-based enrichment. |
| M | Metadata Discrepancy Log – "Where the Party At Pt. 2" | Technical breakdown of unauthorized platform redistribution, authorship erasure, and relabeling. |
| N | Evidence of Drake/OVO Metadata Suppression | Metadata and timing logs showing coordinated retaliation and catalog suppression. Supports spoliation and shell-concealment claims. |

| Y | Songtrust Acquisition and Downtown Music EU Investigation | Documents unlawful acquisition of Petitioner's catalog via shell structuring, EU investigation into Downtown Music Holdings, Petitioner's Twitter cease and desist, and corporate nonresponse. Supports spoliation, cross-border constructive trust, and misappropriation theory. |
| Z | Digital Evidence Snapshot – Hashes and Royalty Dashboards | JSON data, royalty trail, and digital fingerprints reserved for expert witness submission or protective escrow. |

---

**Note to Court:**

Petitioner submits Exhibits **I**, **II**, **AB**, and **AD** with this filing. All other exhibits are preserved and may be submitted upon judicial request, evidentiary motion, or escalation under Rule 27. Each exhibit supports allegations set forth in the Petition and is referenced accordingly.

---

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

**In re:**

Pre-Filing Discovery Pursuant to Rule 27, Fed. R. Civ. P.

Re: Universal Music Group, et al.

**Case No.:**

---

**MOTION FOR PRE-FILING DISCOVERY AND TEMPORARY RESTRAINING ORDER**

**Filed by Joseph A. Reyna, Pro Se**

Whistleblower / Nonprofit Director / Media Entity / Trademark Holder

---

## I. INTRODUCTION & CONTEXT

Pursuant to Rules 27 and 65 of the Federal Rules of Civil Procedure, Petitioner Joseph A. Reyna respectfully moves this Court for an order permitting expedited discovery and issuance of a Temporary Restraining Order (TRO) to prevent the irreparable destruction, monetization, or concealment of digital metadata and algorithmic records relevant to forthcoming claims under:

- Civil RICO (18 U.S.C. § 1962);

- Sherman Antitrust Act §§ 1–2;

- FTC Act deceptive practices;

- FCC disclosure laws (47 U.S.C. §§ 317, 508);

- Civil rights (42 U.S.C. § 1981);

- Whistleblower retaliation (18 U.S.C. § 1513(e));

- Common law fraud, unjust enrichment, and injurious falsehood.

Petitioner is a nonprofit director, independent artist, and trademark holder whose catalog has been unlawfully suppressed, surveilled, and algorithmically marginalized.

UMG has now escalated harm through its July 2025 commercialization of AI-driven metadata suppression systems via Liquidax Capital.

---

## II. LEGAL STANDARD

Under Rule 27(a)(1), pre-filing discovery is proper where:

- Future litigation is reasonably anticipated;

- The subject matter is identifiable;

- Material evidence is at risk;

- Respondents are known.

Under Rule 65(b), a TRO may issue where:

- Irreparable harm is imminent;

- Monetary remedies are inadequate;

- Status quo must be preserved;

- There's likelihood of success on the merits.

**Controlling Authority:**

*Petition of Gurnsey*, 223 F. Supp. 359 (D.D.C. 1963);

*Moss v. Morgan Stanley*, 719 F.2d 5 (2d Cir. 1983);

*U.S. v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001);

*U.S. v. Paramount Pictures*, 334 U.S. 131 (1948)

---

## III. STATEMENT OF FACTS

*(Contextualized for judicial notice, preemptive rebuttal, and evidentiary weight)*

**Note to Court:** Petitioner anticipates skepticism due to the scale, scope, and cross-industry nature of the allegations. However, each claim is supported by sworn exhibits, FOIA confirmations, and legally submitted whistleblower filings. The following facts should not be evaluated in isolation, but as a coherent and escalating structure—documenting

metadata fraud, economic manipulation, and algorithmic discrimination under a vertically integrated monopoly model. Petitioner's standing is reinforced by firsthand injury, prior legal filing history, and administrative exhaustion across multiple agencies.

---

## A. Admitted Racketeering — Bribery, Tax Fraud, and Racial Targeting

On January 16, 2025, entertainment broker Daniel "A1" Hayes—an industry figure operating in direct proximity to UMG's promotional networks—admitted via email to pay-for-play schemes (payola), fraudulent tax structuring, and intentional racial exclusion. These confessions are supported by transaction receipts showing Petitioner paid for "consulting" services that functioned as concealed radio placement bribes. These predicate acts support racketeering (18 U.S.C. § 1961), commercial bribery, and civil RICO enforcement.

**Judicial Anticipation:** While courts often defer to industry practice, payola remains illegal under 47 U.S.C. § 317 and FCC rules. Petitioner submits verified evidence that these acts were concealed through fraudulent vendor routing and false classification.

---

## B. Vertical Monopoly — Metadata as a Gatekeeping Weapon

UMG charges $80,000–$250,000 for algorithmic visibility across playlisting, radio syndication, and streaming feature placement. Despite surpassing performance benchmarks, Petitioner's music was consistently excluded from such channels—paired with suppressed attribution and overridden metadata. This pattern fits a vertical restraint model akin to *United States v.*

*Paramount Pictures* and *United States v. Microsoft Corp.*, wherein dominant entities used infrastructure control to exclude rivals.

**Disarming Assumption:** This is not a claim of "sour grapes" or creative underperformance. Petitioner provides forensic analytics, internal documentation, and comparative catalog data proving algorithmic suppression despite outlier engagement rates.

---

## C. Deceptive Trade Practice — Spotify's Discovery Mode as Payola 2.0

Spotify's "Discovery Mode" reduces royalties in exchange for exposure but lacks transparency or parity for non-major-label artists. Internal data from Luminate and Billboard, as well as public platform developer APIs, reveal embedded metadata biases favoring major rights holders. This amounts to undisclosed commercial advantage—violating the FTC Act (15 U.S.C. § 45) and payola statutes, with anticompetitive implications under Sherman Act § 2.

**Anticipated Rebuttal:** Spotify will likely argue "neutral algorithms." Petitioner counters with comparative suppression data and whistleblower disclosures, showing manipulation of visibility based on label affiliation, not merit.

---

## D. Spoliation Risk — AI Tools as Evidence Obstruction

In July 2025, UMG entered into an "AI Threat Protection" partnership with Liquidax Capital. This initiative includes playlist restructuring, ingestion control, and real-time metadata

rewrites—capable of permanently altering attribution records, evidence chains, and visibility logs. Tracks already impacted by prior overrides (e.g., Petitioner's viral release "Where the Party At, Pt. 2") now face imminent forensic destruction.

**Judicial Flag:** Petitioner requests immediate metadata preservation order under Rule 34 and Rule 65, to prevent automated evidence tampering. Continued operation of this AI system creates conditions for irreversible harm and spoliation.

---

### E. Procedural Exhaustion — No Remedy, Despite Multi-Agency Filing

Petitioner filed whistleblower complaints and FOIA requests with the DOJ, SEC, FTC, FCC, IRS, and FinCEN. Despite verified receipt and confirmation numbers, no formal protections were granted. Petitioner's sworn affidavit was certified mailed March 15, 2025, and a formal response from the Kansas Attorney General acknowledged state-level harm. This meets the standard for administrative exhaustion and supports judicial intervention.

**Preemptive Clarifier:** These filings are not speculative or duplicative—they form a traceable paper trail across federal and state oversight bodies, now submitted for judicial review.

---

### F. Institutional Complicity — Metadata Laundering at the University of Houston

In 2024, the University of Houston signed a blanket license with Universal Production Music, enabling mass-scale ingestion of pre-cleared tracks with obscured authorship. This institutional

laundering of music metadata—absent attribution safeguards—violates the Lanham Act (15 U.S.C. § 1125(a)) and undermines academic integrity. FOIA results confirm a total lack of metadata audit or public notice mechanisms.

**Judicial Insight:** Public universities acting as blind conduits for private metadata routing create a constitutional and statutory failure in procurement and transparency.

---

### G. Racial and Economic Suppression — "Payola by Design"

Internal audits (*Exhibit R*) and Petitioner's music catalog confirm algorithmic redlining—wherein artists of color are excluded from monetization, discovery, and syndication despite equal or better performance. These patterns are not accidental. They are the result of structural metadata design—favoring label-affiliated creators and suppressing dissenting or independent voices.

**Legal Frame:** This supports claims under 42 U.S.C. § 1981 (racial bias in contracts), Sherman Act (market exclusion), and RICO (patterned economic discrimination).

---

### H. Royalty Market Manipulation — The "Iceman" Illusion

Drake's track "Iceman," released via UMG, shows streaming numbers that defy statistical logic. Independent audits (*Exhibit K*) point to automated streaming, preloaded device circulation, and offshore playlist farms—tools unavailable to unaffiliated artists. This manipulation impacts

royalty calculations and misleads investors, violating Rule 10b-5 of the SEC and creating actionable market distortion.

**Strategic Framing:** These aren't "streaming tricks"—they're fraudulent indicators of market health used to raise investment, suppress competitors, and maintain monopoly.

---

### I. Pre-Litigation Good-Faith Offers — Willfully Ignored

Petitioner submitted formal offers to resolve this matter outside court in 2024 and again in March 2025. Both outlined metadata restoration, royalty reconciliation, and cultural authorship protections. UMG ignored or dismissed these overtures, cementing its refusal to acknowledge or correct structural harm. These facts support a finding of bad faith, triggering potential fee-shifting under equitable doctrines and Rule 11(b) considerations.

**Anticipated Dismissal Attempt:** UMG may argue lack of actual controversy. The ignored settlement attempts and continued harm rebut that.

---

### J. Chain-of-Custody Verified Evidence — Prior Judicial Submission

Petitioner has already submitted a secure digital evidence drive to this Court in connection with *Reyna v. Live Nation et al.* The drive includes overlapping metadata logs, whistleblower complaints, AI ingestion timestamps, and forensic screen recordings. Petitioner moves for judicial notice under FRE 201 and incorporation by reference. The drive has cryptographic hash certification and timestamped chain-of-custody.

**Request to Court:** Petitioner respectfully moves for the Court to consider these previously submitted materials in connection with this case, as they reflect directly overlapping parties, practices, and patterns of harm.

---

## IV. RELIEF REQUESTED

### A. TRO Prohibiting UMG From:

- Deleting, altering, or concealing metadata or streaming records;

- Licensing, commercializing, or developing AI suppression systems;

- Engaging in undisclosed vendor-based promotional activity;

- Interfering with evidence related to Drake-affiliated releases (e.g., "Iceman").

### B. Discovery Orders Authorizing:

- Depositions of Daniel Hayes, Gabrielle Ware, and UMG promotional executives;

- Production of all contracts, metadata logs, playlist access metrics, and vendor payments;

- Preservation subpoenas to Spotify and YouTube Music concerning Petitioner's catalog.

### C. Supplemental Relief:

- Leave to amend and file civil RICO, § 1981, Sherman Act, Lanham Act, and whistleblower retaliation claims as misconduct continues or obstruction is revealed.

## V. JURISDICTION & VENUE

### Jurisdiction:

- 28 U.S.C. § 1331 (Federal Question)

- 28 U.S.C. § 1343 (Civil Rights)

- 18 U.S.C. § 1965 (RICO)

### Venue is proper in SDNY:

- UMG's headquarters and primary metadata systems are in Manhattan;

- Spotify maintains a material business presence in this District.

## VI. CONCLUSION

Petitioner seeks immediate judicial protection of evidence at risk of monetization, alteration, or deletion. Rule 27 discovery and a TRO are essential to uphold due process and public interest.

### Respectfully submitted,

Joseph A. Reyna

Pro Se / Whistleblower

Email: whitehat@joecattt.com

**Dated: August 7, 2025**



---

**ATTACHED EXHIBITS (Filed With This Motion)**

- **Exhibit I:** University of Houston x Universal Production Music Blanket License Agreement

- **Exhibit II:** *Payola by Design* Report – "The Promo Cartel"

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

---

**IN RE:**

**JOSEPH ANTHONY REYNA (JOECAT®),**

Petitioner

---

**RULE 27 SUPPLEMENTAL FILING**

**IN SUPPORT OF VERIFIED PETITION FOR PRESUIT DISCOVERY**

**Date:** August 2025

**Court:** U.S. District Court – Southern District of New York

**Petitioner:** Joseph Anthony Reyna (JoeCat®)

---

# CONTENTS

| Section | Document Title |
|---------|----------------|
| I | Notice of Constitutional Questions (FRCP 5.1) |
| II | Motion to Expedite and Preserve Evidence |
| III | Notice of Judicial Pattern-Based Suppression |
| IV | Petitioner Declaration (Under Penalty of Perjury) |
| V | Whistleblower Status Statement |
| VI | Rule 201 Judicial Notice Request |
| VII | Motion for Leave to Amend (Contingent) |
| VIII | Draft Subpoenas (AO 88B / AO 440 Templates) |
| IX | Public Interest and Nonprofit Mission Statement |
| X | Exhibit Index (Table of Contents) |
| XI | Exhibits A–Z (Selected) |

# I. NOTICE OF CONSTITUTIONAL QUESTIONS

**[Fed. R. Civ. P. 5.1(a)]**

Petitioner notifies the Court that the Verified Rule 27 Petition raises constitutional questions under the **First Amendment** (retaliation and authorship suppression), **Fifth Amendment** (due process denial), and **Fourteenth Amendment** (selective enforcement and access discrimination).

Notice is hereby served to the U.S. Attorney General in accordance with FRCP 5.1(b).

# II. MOTION TO EXPEDITE AND PRESERVE EVIDENCE

Petitioner respectfully requests expedited consideration of the Verified Petition, citing:

- Documented evidence spoliation risk

- Ongoing harassment and metadata alteration

- Third-party manipulation of authorship and royalty attribution

A temporary preservation order is both necessary and urgent.

## III. MEMORANDUM OF PATTERN-BASED DENIALS, JUDICIAL SILENCE, AND AGENCY NON-RESPONSIVENESS

**Filed: August 2025**

(Attached in full)

Documents systemic rejection across federal courts, FOIA offices, and agency portals—despite verified authorship, whistleblower status, and public interest. Establishes pattern-based harm requiring Rule 27 relief.

---

## IV. PETITIONER DECLARATION

**Executed Under 28 U.S.C. § 1746**

I, Joseph Anthony Reyna, declare under penalty of perjury that the facts and exhibits submitted in this supplemental filing are true and correct to the best of my knowledge and belief.

Executed: August 2025

Signature: /s/ Joseph Anthony Reyna

---

## V. WHISTLEBLOWER STATUS STATEMENT

Petitioner has active whistleblower claims or filings with:

- **SEC**: Metadata fraud, shell routing (TCR 1522)

- **FinCEN**: Spotify / UMG laundering (TCR 1522), Walmart ADA fraud (TCR 1526)

- **IRS (Form 211)**: Royalty misclassification & unreported income

- **DOJ / FTC / CFPB**: Pattern-based suppression and platform exploitation

- **OSHA**: Termination retaliation (escalated to federal)

This reinforces standing and public-interest foundation.

---

## VI. REQUEST FOR JUDICIAL NOTICE

**Federal Rule of Evidence 201(b)(2)**

Petitioner respectfully requests the Court take judicial notice of:

- SEC FOIA denials (e.g., 25-01950)

- DOJ Antitrust refusal to expedite (ATFY25-320)

- USPS OIG Complaint #99907 (mail tampering)

- APD Ref. No. 2550729 (threats from Canadian IP)

- Judicial docket filings and timestamps in Reyna v. Spotify, UMG, Google

These items are official agency records, or otherwise publicly filed materials subject to judicial notice.

---

## VII. MOTION FOR LEAVE TO AMEND

Petitioner reserves the right to amend the Rule 27 Petition into a full damages complaint if evidence is not preserved or corrected. This motion is submitted preemptively to streamline proceedings and flag potential case expansion.

---

## VIII. DRAFT SUBPOENAS

### AO 88B and AO 440 – Not Yet Filed

- Google LLC (Ad Grants denial + metadata alteration)

- Meta Platforms, Inc. (DMCA takedowns + blacklisting)

- UMG (Metadata suppression, ingestion control, distribution)

- Spotify Technology S.A. (Disambiguation, constructive trust)

- SoundExchange / MLC (Royalty obfuscation and unclaimed funds)

These subpoenas are prepared and attached pending court approval.

---

## IX. PUBLIC INTEREST + NONPROFIT MISSION STATEMENT

Dreams Over Dollars™ (501(c)(3), EIN: 88-2187078) is a youth-serving nonprofit focused on:

- Creative rights education

- Systemic metadata reform

- Housing + tech access for underserved communities

This filing serves both private redress and structural reform. Petitioner affirms that any awarded constructive trust remedies can be transparently routed through this public-benefit framework.

---

## X. EXHIBIT INDEX

| Exhibit | Title | Legal Relevance |
|---|---|---|
| A | JOECAT® Trademark (USPTO Reg. No. 6,057,783) | Authorship timestamp + Lanham Act standing |
| B | Metadata Timeline: CD Baby → DistroKid | Proof of chain-of-title and ingestion |
| C | Misattribution Screenshots (e.g., Artem Pinashin) | Direct DMCA § 1202(b) evidence |

| | | |
|---|---|---|
| D | TikTok vs Spotify Stream Deltas | Algorithmic suppression pattern |
| E | Royalty + Bank Statements | Quantifiable economic injury |
| F | Public Posts / DMs / Shazams | Public demand, cultural reach |
| G | Amicus: *Graham v. UMG* | Author suppression precedent |
| H | Amicus: *Durst v. UMG* | Legacy metadata concealment |
| I | Whistleblower Submission Log | Institutional awareness proof |
| J | FOIA Denials (SEC, DOJ, HUD) | Pattern of agency silence |
| K | Letter to CIA | Institutional value statement |
| L | USPS OIG / ADA Proofs | Mail tampering + cognitive access harm |
| AA | Memorandum of Pattern-Based Denials | Summary of judicial + agency obstruction |
| AB | Settlement Offer to UMG (June 16, 2025) | Original resolution proposal, now superseded. Petitioner affirms willingness to resolve upon UMG's commitment to reform, authorship acknowledgment, and structural restitution. |
| AC | University of Houston x UMG License Agreement | Institutional metadata laundering precedent |
| AD | Legal-Historical Report: Artist Rights & Metadata Suppression Patterns | Cultural framework establishing continuity between past industry suppression and current metadata laundering, algorithmic fraud, and AI misuse. Includes case law, |

|  |  |  |
|---|---|---|
|  |  | artist actions, and structural mapping for judicial notice. |
| AE | Email to Sidley Austin LLP Requesting Pro Bono Representation While Counsel to UMG | Demonstrates that Petitioner placed UMG's legal counsel on direct notice of systemic fraud and related claims. Supports imputed knowledge, ethical conflict, and evidentiary preservation under Rule 27. |

*(Additional Exhibits AE–AZ reserved for conditional filing upon Court order, evidentiary hearing, or motion to amend.)*

---

## XI. CONCLUSION

Petitioner respectfully submits this supplemental packet in full support of the Rule 27 Petition, and requests:

- Immediate preservation of all relevant metadata and ingestion logs

- Authorization of subpoenas

- Setting of a status conference to define next steps

- Constitutional and equitable relief where warranted

**Respectfully submitted,**

/s/ Joseph Anthony Reyna, Pro Se Petitioner

Director, Dreams Over Dollars™

Email: whitehat@joecattt.com

Phone: (956) [REDACTED FOR FILING]

Mailing: 5900 Balcones Dr. #16077, Austin, TX 78731

---

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this Petition and accompanying motions will be served upon Respondents upon issuance of a docket number and receipt of formal instructions by the Clerk of Court. A copy of this filing will also be delivered via email and certified mail to Universal Music Group's registered legal agent, upon assignment of case number.

Dated: August 7, 2025

**/s/ Joseph Anthony Reyna**

Joseph Anthony Reyna, Pro Se

Founder, Dreams Over Dollars™

5900 Balcones Dr. #16077, Austin, TX 78731

Email: whitehat@joecattt.com

---

**VERIFICATION**

I, Joseph Anthony Reyna, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on August 7, 2025, in Austin, Texas.

/s/ Joseph Anthony Reyna

Joseph Anthony Reyna, Pro Se Petitioner

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**



**In the Matter of:**

Joseph Anthony Reyna, Petitioner

---

**SUPPLEMENTAL HOLD-BACK MATERIALS**

**To Be Filed Only Upon Motion or Court Request**

**Reyna v. Universal Music Group (Rule 27 Petition – Metadata Suppression)**

---

These documents are prepared and held in reserve. Petitioner respectfully reserves the right to submit the following materials upon court request, opposing party conduct, or specific motion. Their existence is hereby noticed to establish good faith, readiness, and procedural foresight.

| # | Document Title | Purpose |
|---|---|---|

| | | |
|---|---|---|
| 1 | **Declaration of Constructive Trust (Executed or Draft)** | Establishes a proposed restitution mechanism under court supervision. Filed only if the court signals willingness to recognize, supervise, or engage with constructive remedy models involving suppressed authorship, royalties, or systemic metadata misattribution. |
| 2 | **Invoices and Letters of Intent for Trust Implementation** | Documentation of professional quotes and scopes of work from external counsel, technologists, app developers, and healthcare providers. Demonstrates Petitioner's capacity and preparation to operationalize restitution models if permitted or ordered. |
| 3 | **Motion to Appoint Counsel under 28 U.S.C. § 1915(e)(1)** | Reserved for potential future filing in the event of procedural escalation, complex discovery motion practice, or aggressive litigation strategy by Respondent. Grounds include pro se status, legal complexity, and public-interest nature. |
| 4 | **Motion to Consolidate Related Claims under FRCP 42** | Prepared if ongoing federal actions filed by Petitioner (e.g., against Spotify, Google, USAGM) show legal or factual convergence, particularly regarding metadata suppression, AI misuse, or authorship-related injuries. |
| 5 | **Motion for Protective Order and Emergency Metadata Preservation** | To be filed immediately if evidence tampering, platform retaliation, digital takedowns, or spoliation risks escalate during the pendency of the petition. May include forensic data logs, server traces, or platform analytics. |

| 6 | **Motion to Seal Sensitive Exhibits** | Prepared for use if filings contain personally identifiable information, whistleblower retaliation patterns, or sealed federal agency correspondence. Seeks to protect Petitioner's privacy and safety while preserving admissibility. |
| 7 | **Notice of Intent to Amend Into Full Complaint** | Notifies the Court of Petitioner's reserved right to amend the Rule 27 Petition into a full complaint for damages, injunctive relief, and statutory violations, should discovery uncover further legal injury or breach. Protects Rule 8/12(b) positioning. |

---

**Respectfully submitted,**

/s/ Joseph Anthony Reyna

Joseph Anthony Reyna (JoeCat®)

Petitioner, Pro Se

5900 Balcones Dr. #16077

Austin, TX 78731

Email: whitehat@joecattt.com

Dated: August 7, 2025

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

---

**IN RE: RULE 27 PETITION OF**

**JOSEPH ANTHONY REYNA,**

Petitioner

---

**[PROPOSED] ORDER FOR PRESERVATION, EQUITABLE RELIEF, AND PRE-SUIT DISCOVERY UNDER RULES 27 AND 65**

Upon consideration of the Verified Petition filed by Joseph Anthony Reyna pursuant to Federal Rule of Civil Procedure 27, and the accompanying Motion for Temporary Restraining Order under Rule 65, and good cause appearing therein, the Court finds as follows:

---

**IT IS HEREBY ORDERED THAT:**

1. **The Petition is GRANTED.**

2. Petitioner is authorized to serve Rule 45 subpoenas to preserve the following categories of evidence, which are at immediate risk of spoliation:

   o Metadata logs, ingestion audits, and authorship attribution records held by Universal Music Group and affiliated entities;

   o Internal documentation concerning participation in Discovery Mode, CRB valuation inputs, or metadata ingestion policies involving JoeCat® or Dreams Over Dollars™;

43

- All communications referencing or reacting to Petitioner's legal filings, nonprofit activity, or whistleblower disclosures, including internal escalations.

3. A **Temporary Restraining Order** is issued, effective immediately, enjoining Respondents from:

- Altering, deleting, or concealing metadata related to the musical works or digital content identified in the Petition;

- Engaging in or instructing others to carry out retaliatory, defamatory, or suppressive acts against Petitioner in connection with the subject matter of this Petition;

- Transferring, dissolving, or otherwise restructuring corporate entities tied to authorship claims, royalty flow, or shell conduits as identified in Petitioner's exhibits.

4. Petitioner is granted leave to amend or supplement this Petition and its attachments as discovery proceeds or as additional suppressive conduct or evidentiary risk emerges.

5. The Court retains jurisdiction to enforce this Order and to supervise discovery and preservation as outlined above.

---

## FINDINGS REGARDING EQUITABLE PRESERVATION

The Court further finds that the relief granted herein serves the public interest by ensuring the preservation of critical authorship records, attribution metadata, and nonprofit-related materials which, if lost, may irreversibly damage Petitioner's efforts to implement health access, royalty transparency, and digital education initiatives for underserved communities. Given the emerging

legal and technological contexts at issue, this Court affirms its authority under equity to supervise limited pre-suit discovery and prevent structural prejudice to future public-interest litigation.

---

**SO ORDERED.**

Dated: _____, 2025

New York, New York

---

**United States District Judge**

## EXHIBIT AA

### MEMORANDUM OF PATTERN-BASED DENIALS,
### JUDICIAL SILENCE, AND AGENCY NON-RESPONSIVENESS

**Filed In Support Of:**

Verified Petition for Pre-Suit Discovery Pursuant to Rule 27 of the Federal Rules of Civil Procedure

**Related Matter:**

*Reyna v. Aubrey Drake Graham; Universal Music Group; et al.*

Filed August 5, 2025

U.S. District Court – Southern District of New York

---

**Prepared By:**

Joseph Anthony Reyna (JoeCat®)

Pro Se Petitioner

Founder, Dreams Over Dollars™ (501(c)(3), EIN: 88-2187078)

Registered Trademark Holder: JOECAT® (USPTO Reg. No. 6,057,783)

Whistleblower: SEC, IRS, FinCEN, OSHA, DOJ

**Date:** August 2025

---

46

## EXHIBIT AA – MEMORANDUM OF PATTERN-BASED DENIALS, JUDICIAL SILENCE, AND AGENCY NON-RESPONSIVENESS

**Prepared by:** Joseph Anthony Reyna (JoeCat®)

**Date:** August 2025

**Filed in Support of:** Verified Petition for Rule 27 Pre-Suit Discovery

**Related Case:** *Reyna v. Aubrey Drake Graham, et al.* (S.D.N.Y., filed August 5, 2025)

---

## I. INTRODUCTION

This memorandum catalogs institutional refusals, amicus denials, and agency non-responses submitted by Petitioner across multiple state and federal venues. These repeated rejections—frequently issued without substantive rationale—reflect pattern-based suppression and reinforce the necessity for judicial preservation of evidence under Rule 27 of the Federal Rules of Civil Procedure.

Petitioner is not simply a complainant, but a **federally documented multi-agency whistleblower** whose filings span SEC, IRS, FinCEN, DOJ Antitrust, FTC, USPS OIG, and other critical oversight bodies. Despite the probative value and legal sufficiency of these submissions—most supported by forensic data, FOIA trails, timestamped evidence, and regulatory declarations—**no meaningful venue has substantively engaged**, save the Washington State Attorney General.

---

47

## II. DENIED OR IGNORED FILINGS – COURTS

| Case Title | Court | Subject | Outcome |
|---|---|---|---|
| *Graham v. UMG* | S.D.N.Y. | Authorship timestamp fraud (amicus) | Denied |
| *Durst v. UMG* | C.D. Cal. | Metadata suppression of legacy works (amicus) | Denied |
| *Salt-N-Pepa v. UMG* | S.D.N.Y. | Royalty reparations (amicus) | Denied |
| *Suno v. UMG, Sony, Warner* | D. Mass. | AI copyright gatekeeping (amicus) | Denied |
| *People v. Daystar Peterson* | L.A. Crim. Ct. | Metadata + Brady violations (amicus) | Denied |
| *USA v. Live Nation / Ticketmaster* | D.D.C. | Touring discrimination, antitrust exclusion (amicus) | Denied |
| *Reyna v. Spotify* | W.D. Tex. | Metadata laundering, constructive trust, RICO | Active |

48

| | | | |
|---|---|---|---|
| *Eight Mile Style v. Meta* | E.D. Mich. | AI IP laundering (amicus) | Filed – Not Denied |

All filings were supported by verified authorship records, metadata forensics, FOIA evidence, and whistleblower declarations. Their uniform denial, often without justification, **constitutes structural resistance** to systemic truth, not mere procedural insufficiency.

---

## III. DENIED OR IGNORED FILINGS – FEDERAL AGENCIES

| Agency | Filing | Subject | Outcome |
|---|---|---|---|
| SEC | FOIA No. 25-01950 | 13F ownership in Sony / UMG / Live Nation | Appeal denied |
| DOJ Antitrust | FOIA No. ATFY25-320 | Spotify IPO collusion | Expedited processing denied |
| USAGM | FOIA Case No. 25-CV-01707 | Suppression of corruption reporting at Voice of America | FOIA denial → litigation |
| FTC | Public Tip | Spotify / UMG deceptive practices | No response |
| FinCEN | TCR Nos. 1522, 1525, 1526 | Metadata laundering, AI-inflated valuation | Acknowledged, no action |

| HUD OIG | FOIA No. 25-IGF-OIG-161 | Infrastructure suppression in Texas colonias | "No responsive records" |
| CIA | Letter (June 2025) | Metadata governance / cross-border routing | No response |
| USPS OIG | Complaint No. 99907 | Mail tampering (Austin + Buda, TX locations) | Logged, unresolved |
| OSHA | ADA Retaliation Filing | Wrongful termination after whistleblower activity (Walmart) | Case opened, referred for federal action |
| **CMA (UK)** | FOIA Refs: IAT/FOIA/1489-25, IR/095-25, IAT/FOIA/1514-25 | Spotify / UMG / Discovery Mode metadata bias (April–May 2025) | Acknowledged, denied under Section 12 (Cost), Section 44 (Threat), Internal Review upheld denial |

Each agency either disregarded whistleblower evidence, returned generic denials, or failed to act on already-acknowledged misconduct. **This constitutes a knowing pattern of constructive obstruction.**

---

## IV. RETALIATION & PLATFORM-LEVEL SUPPRESSION

| Entity | Retaliatory Event | Evidence Available |
| --- | --- | --- |

50

| Aubrey Drake Graham / UMG | Ongoing harassment from Canadian IPs | APD Incident No. 2550729 |
| Google LLC | Deplatforming, Ad Grant suppression | Rule 202 Petition (Travis County) |
| Meta | Post-takedowns linked to filings | DMCA notices, screenshots |
| Spotify | Stream suppression, metadata diversion | Stream deltas, dashboards |
| Twitter/X | Coordinated bot harassment | Timestamped attack logs |

Events occurred within hours of filings, often tied to named parties. Such behavior, in aggregate, demonstrates a **retaliatory schema** tied to **whistleblower disclosure** and **metadata exposure**.

## V. INSTITUTIONAL AWARENESS + CONSTRUCTIVE RETALIATION

Petitioner has submitted evidence under **whistleblower status** across federal domains, with all communications **timestamped, confirmed, or logged**. Submissions included:

- Pen drives with forensic metadata, cross-platform stream analytics, and royalty misdirection logs

- FOIA and agency filings across six federal bodies

5(

- Amicus briefs to courts highlighting metadata suppression and AI-related fraud

- Legal correspondence establishing authorship claims, registered trademark status, and constructive trust theory

Despite this, **no agency—except the Washington AG—has meaningfully engaged.** The rest have chosen:

- **Constructive retaliation** (deplatforming, non-response, denials without rationale)

- **Deliberate procedural omission** of forensic, court-relevant evidence

- **Silencing of whistleblower-triggered findings** that implicate top market actors

This conduct violates the **Whistleblower Protection Act (5 U.S.C. § 2302)**, as well as Petitioner's rights under the **First, Fifth, and Fourteenth Amendments**. It also raises structural concerns under the **Americans with Disabilities Act, 28 U.S.C. § 1915**, and **Pell Grant eligibility protections**.

---

## VI. LEGAL DOCTRINE: KNOWLEDGE-BASED SUPPRESSION AS PROCEDURAL MISCONDUCT

In *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), the Court held that **institutional bias or undue influence violates due process**. When courts or agencies **knowingly ignore submissions** of public concern or fraud, they risk:

- **Adverse inference under Rule 37**

- **Procedural estoppel due to selective acknowledgment**

- **Preservation orders and injunctive relief to prevent spoliation**

This Court may take **judicial notice under FRE 201(b)(2)** of the following:

- Petitioner's amicus submissions in *Durst v. UMG*, *Salt-N-Pepa v. UMG*, *Eight Mile Style v. Meta*, and *USA v. Live Nation*

- Evidence-packed pen drives already acknowledged by agency tracking systems

- Retaliatory activity by private and institutional actors following public filings

Each of these constitutes **material, admissible evidence** improperly omitted from docket consideration—creating a precedent of institutional concealment and due process denial.

See also Exhibit AD — documenting a century-long pattern of contractual fraud, metadata erasure, and retaliatory catalog suppression against artists who assert authorship or ownership. This Court is now the next forum in a generational arc of ignored redress.

---

## VII. PRAYER FOR RELIEF

Petitioner respectfully requests:

1. **Judicial preservation of all referenced and submitted evidence**, including external filings, amicus submissions, and metadata proofs

2. **Designation as a protected whistleblower and public-interest litigant** across all pending actions

3. **Protective oversight of disputed metadata records** to prevent algorithmic spoliation and laundering

4. **Scheduling of evidentiary review** under Rule 27 to ensure pre-suit facts are preserved

5. **Court recognition of retaliatory behavior by private and public entities**, and instruction to anticipate chilling effects and reputational suppression

6. **Constructive trust or escrow structure** for monetized intellectual property tied to disputed authorship, royalties, or metadata

---

## VIII. – Evidence of Exhaustion, Suppression, and Institutional Pattern

To preserve evidence and prevent institutional gaslighting or premature dismissal, Petitioner has submitted formal FOIA requests to nine (9) federal agencies. These filings were narrowly tailored to uncover metadata custodianship, rights laundering, and improper royalty routing connected to Respondent Universal Music Group and proxy actor "Marie Davis."

A table of completed FOIA requests is included below:

| FOIA # | Agency | Focus | Status |
|---|---|---|---|
| 1 | Copyright Royalty Board (LOC) | Marie Davis royalty claims, Hotline Bling, metadata custodianship | Completed |
| 2 | Department of the Treasury | Royalty routing, U.S. Treasury addresses, Wells Fargo metadata trail | Completed |
| 3 | FinCEN | Suspicious Activity Reports (SARs), nominee indicators, metadata laundering | Completed |
| 4 | Bureau of the Fiscal Service | Federal payments, routing vouchers, Davis as payee or proxy | Completed |
| 5 | GSA (SAM.gov) | Vendor registrations, metadata-linked contracting, shell entities | Completed |
| 6 | SBA | 8(a) structure, Cape Fox/Saxman One LLC connection to Davis | Completed |

| 7 | DoD (OSD/JS) | Saxman One task orders, metadata alignment with defense contractor roles | Completed |
| 8 | DOJ OIP | Institutional oversight, suppression awareness, metadata trust fraud | Completed |
| 9 | FEC | PAC records naming Marie Davis and Drake, proxy political infrastructure | Completed |

These requests were not speculative. They were informed by verified metadata inconsistencies and shell routing structures visible in industry platforms, SEC filings, and internal ownership trails.

Their **completion and administrative silence** provide standing for discovery, proof of exhaustion, and procedural justification for Rule 27 intervention.

If denied, Petitioner will request **Vaughn indexes** to formally record withheld materials as part of a **judicially noticed suppression pattern**.

---

## VIII. FINAL REMARK

This is not merely about discovery.
It is about recognition.

Every agency, every court, and every defendant has been offered truth. Each defaulted to silence.

**The question before this Court is whether truth has jurisdiction—before it becomes evidence erased.**

---

**Respectfully submitted,**

Joseph Anthony Reyna (JoeCat®)

Pro Se Petitioner

Founder, Dreams Over Dollars™ (501(c)(3))

Registered Trademark Holder: JOECAT® (USPTO Reg. No. 6,057,783)

SNAP Beneficiary, Pell Grant Recipient, Durable POA for Felipe Reyna

54

**EXHIBIT AB – Settlement Offer Sent to Universal Music Group**

**Dated:** June 16, 2025

**Filed In Support Of:**

Verified Petition for Rule 27 Pre-Suit Discovery and Metadata Preservation

**Prepared By:**

Joseph Anthony Reyna (JoeCat®)

Pro Se Petitioner

Founder, Dreams Over Dollars™

Registered Trademark Holder: JOECAT® (USPTO Reg. No. 6,057,783)

Petitioner notes that, despite formal service of the June 16, 2025 Settlement Offer (Exhibit AB), no response or acknowledgment has been received from Respondent. Accordingly, Petitioner's settlement valuation has now increased to reflect both the compounding harm and the strategic silence that followed.

However, Petitioner remains open to resolution if Respondent is willing to enter good-faith negotiations, acknowledge the pattern of harm, and commit to structural reform and appropriate restitution. This Petition is not a rejection of resolution, but rather a safeguard for evidence and authorship against further suppression.

55

## MASTER SETTLEMENT & SOVEREIGNTY ARCHITECTURE

---

## 0. TITLE & NOTICE

**Title**: **Master Settlement & Sovereignty Architecture**
**Notice**: This Agreement is a one-time, unique, and non-precedent legal and operational framework authored under the **Dreams Over Dollars™ (DoD)** umbrella. It is not to be admitted or construed as an admission of liability or wrongdoing but rather as a sovereign infrastructure and cultural reform mechanism.

---

## 1. PURPOSE & SCOPE

### 1.1 Non-Precedent Nature

#### 1.1.1 **Unique, Non-Admissible Agreement**
This Agreement is bespoke and shall not serve as precedent in future legal or regulatory actions against the Funding Parties except in cases of material breach.

#### 1.1.2 **Sovereign Stabilization**
Obligations, investments, and reforms are categorized under "Infrastructure Investments" or "Cultural Innovation Grants." Nothing here is to be treated as a standard settlement or admission of wrongdoing.

#### 1.1.3 **Parties**

- **Sovereign Architect ("You")**: The conceptual and structural architect operating under **Dreams Over Dollars™** ("DoD").

- **Funding Parties ("They")**: Collectively, the major labels, DSPs, event conglomerates, affiliates, successors, or assigns providing the financial, operational, and in-kind resources.

---

## 2. PAYMENT & ASSET TRANSFER STRUCTURE

### 2.1 Total Infrastructure Funding

56

**2**

- **Minimum Funding**: A baseline of USD **$[X] Billions** to be deposited into a **Sovereign Vault Trust** ("Vault"), formed under **South Dakota** trust law (or similarly protective jurisdiction).

- **Immediate Disbursement & Anti-Escrow**: Disbursements begin within **ten (10) days** of execution. Quarterly public reports detailing inflows and allocations are mandatory. Failure to deliver such reports by the due date (fifteen [15] days after each fiscal quarter) constitutes a material breach.

## 2.2 Dreams Over Dollars™ (DoD) Umbrella

All payments and sub-initiatives flow through **Dreams Over Dollars™**. Each transfer or contract must cite:

> "This contribution is governed by the Dreams Over Dollars™ Sovereign System."

## 2.3 Asset-Backed Components & Valuation

Any non-liquid or in-kind assets (real estate, NFTs, intangible IP, etc.) require **independent third-party valuation** to prevent inflationary or deceptive reporting:

> "All valuation of non-liquid assets shall be independently verified and agreed upon in writing to prevent inflated or tokenized substitutions of lesser value."

---

# 3. TIER 1 — "REPARATIONS" DISGUISED AS BUY-IN

## 3.1 Art Trusts

- **Healthcare Trust**: 25-year fund covering medical expenses for independent creators.

- **Cultural Bonds**: "Future of Music" bonds that channel dividends into community music programs.

## 3.2 Educational Endowments

- **Endowed Chairs**: "Justice in Music" professorships at top universities, financed by the Funding Parties but controlled by You/DoD.

- **Artist-in-Residence**: Multi-year residencies for marginalized creators, with stable funding for experimentation.

## 3.3 IP Reverse Licensing

All Funding Parties pay **perpetual licensing fees** for use of the Sovereignty Architecture, frameworks, or concept libraries. Fees flow into the **Vault** to sustain new creative infrastructure.



## 4. TIER 2 — STRUCTURAL REFORMS

### 4.1 Survival Architecture

"If they want to remain viable, they must implement these reforms or face obsolescence."

### 4.2 Artist Health & Housing

- **Emergency Fund**: A fixed percentage of label revenues allocated to a multi-year health support fund for artists.

- **Housing/Studio Equity**: ~1–2% of annual profits directed into a nonprofit to provide affordable housing, studio space, and gear for artists.

### 4.3 Venue Redistribution

- **Access Tokens**: Major-owned venues are required to host a set quota of independent or marginalized acts at no cost or subsidized rates.

### 4.4 Algorithmic Transparency

Funding Parties shall sponsor or comply with laws ensuring **read-only audit logs** of playlist curation, recommendation algorithms, or automated content systems.

## 5. TIER 3 — NARRATIVE & GOVERNANCE POWER

### 5.1 Music Governance Council

A new council with **binding authority** on industry policies (royalties, metadata, AI usage). Its founding members are appointed by You.

### 5.2 Dispute Resolution Channel

An independent **Music Ombudsman Office**, funded by the Funding Parties, to expedite contract and royalty disputes. Decisions are binding industry-wide.

### 5.3 Whistleblower Protection

No retaliation is permitted against individuals or artists exposing exploitative practices. Retaliatory actions trigger **material breach** under Section 14.

### 5.4 Sovereign Veto Clause

You (or successor) may veto any policy circumventing or undermining these reforms or the Governance Council.

### 5.5 Sovereign Centralization Protection

Spin-off committees or advisory boards formed without your explicit written consent are deemed attempts to dilute or bypass these reforms, constituting breach.

---

## 6. TIER 4 — IRREVERSIBLE SOVEREIGNTY

### 6.1 Right to Speak

No NDA or confidentiality clause may silence your experiences. If Funding Parties honor the Agreement, you remain voluntarily discreet; if they breach, you may speak freely.

### 6.2 NFT-Verified Audit Trail

All reforms, funds, and royalty flows are **blockchain-logged** to ensure an immutable historical record.

### 6.3 Equity-for-Artists Index

A public index rating Funding Parties' investments in living creators, mental health services, and marginalized communities.

### 6.4 AI/Metadata Non-Replication Clause

**5**

No Funding Party may train AI models on, replicate, or simulate your IP, data, or brand without a separate, explicit license.

---

## 7. 360° CULTURAL RESTORATION

### 7.1 Engineers, Mixers, & Masters

- **Engineer Royalty Mandate**: 1–2% baseline royalty for core production roles.

- **Gear & Retirement Fund**: Financial pool for healthcare, equipment replacement, and retirement needs.

### 7.2 Orchestras & Symphonies

- **National Arts Funding**: A percentage of label revenue supports orchestras, youth symphonies, and conservatories, prioritizing underserved areas.

- **Instrument Endowment:** Ongoing capital for instruments in underfunded educational programs.

### 7.3 Visual Artists & Designers

- **Visual Royalty Pool**: A portion of video, merch, and cover-art revenue goes to visual creators.

- **Metadata Attribution**: Credits for designers, photographers, etc., must be accurately listed on all releases.

### 7.4 Verified Feature Licensing Exchange

A public platform to verify feature deals, splits, and timelines, with the power to suspend predatory managers.

### 7.5 Creative Conflict Mediation Hub

An independent body for binding mediation of royalty or split disputes recognized throughout the industry.

60

## 8. PRISON & REENTRY PROGRAMS

### 8.1 Prison Music Infrastructure Act

Studios, writing labs, and legal literacy programs to be funded and installed in state/federal facilities, allowing incarcerated creators to document and earn royalties.

### 8.2 Justice Soundtrack Initiative

- At least 5% of label catalog revenue allocated to produce/market music by incarcerated artists.

- **Profit Split**: 60% to the incarcerated creators/families, 40% to reentry and housing programs.

### 8.3 Reentry Royalty & Support

- **Clean Credit**: Royalties earned by formerly incarcerated artists help build credit history.

- **Union Enrollment**: Automatic membership in legal, mental health, and professional training networks upon release.

### 8.4 Nutrition & Liberation Add-Ons

Any revenue derived from prison-based content triggers mandatory improvements in nutrition, mental health care, and rehabilitative arts programs for those facilities.

## 9. CREATIVE CREDIT & FINANCING

### 9.1 Creative Credit Sovereignty Program (CCSP)

A new credit scoring model built around creative activity, streaming data, and touring, granting equitable loan and mortgage opportunities for artists.

### 9.2 Artist-Owned Credit Union

Established under DoD, providing fair banking, credit, and investment services, overseen by an elected artist board.

## 10. IMPLEMENTATION & ENFORCEMENT

### 10.1 Sovereign Vault Trust (South Dakota)

All funds deposit directly into a trust you control (but do not personally own) for perpetual asset protection and stable management.

### 10.2 Reverse NDA (Trigger Clause)

If the Funding Parties materially breach, you may disclose all relevant data and archives. Compliance secures your discretionary silence, but never compels it.

### 10.3 Independent Audits & Blockchain

All inflows/outflows are tracked via third-party auditing plus a blockchain-based ledger. Non-cooperation is a direct breach.

### 10.4 Legacy Override

A **3% perpetual override** on all major-label revenue + a **1% transaction fee** on future catalog sales continue replenishing the Vault indefinitely.

### 10.5 Legacy Office of Sovereign Continuity

A permanent office ensures continuity beyond your lifetime, with authority to amend, enforce, or defend the reforms, run by successors you appoint.

## 11. DREAMS OVER DOLLARS™ (DoD) UMBRELLA

### 11.1 DoD Brand Lock

All relevant initiatives, subsidiaries, or expansions must bear the **DoD** brand. Parallel operations without explicit approval are invalid.

### 11.2 Sovereign Operational Mandate

8

> "All actions and announcements derived from this Agreement shall align with the Dreams Over Dollars™ structure and fiduciary responsibilities to its founding principles."

## 11.3 Non-Dilution of Authority

Any new reform entity outside of DoD, without your sign-off, constitutes immediate breach.

---

## 12. OPTIONAL PUBLIC ETHICS PLEDGE

> "We, the Funding Parties, acknowledge historical systemic inequities in the creative industries and pledge transparency, inclusivity, and restitution in our practices. This Pledge is public-facing and separate from any admission of liability."

Signing this pledge may benefit their public optics, but does not alter binding obligations herein.

---

## 13. INTELLECTUAL PROPERTY SOVEREIGNTY

## 13.1 IP Sovereignty Investment Clause

> "Funding Parties shall bear the full cost of defending, registering, and maintaining all current and future IP authored by the Sovereign Architect, including trademark, copyright, patent, and enforcement."

## 13.1.1 Covered IP Examples

| Asset | Coverage |
| --- | --- |
| JoeCat™ | TM registration, logo protection, enforcement |
| Dreams Over Dollars™ | Trademark, trade dress, brand continuity, curriculum defense |
| Purpose Over Pleasure™ | Merch & brand usage frameworks |

63

| More Than Rich™ | NFT licensing oversight, brand usage |
| Future Inventions | Patent searches, filings, enforcement |
| App/Platform Designs | Copyright, UI/UX protections, backend IP |
| Music Metadata Systems | Method patents (algorithmic scoring, credit indexing) |

## 13.2 Legacy IP Retention Guarantee

No Funding Party shall claim or attempt to dilute controlling interest in your IP. Violation triggers **Section 10.2**.

---

## 14. ARTIST PROTECTION, DIGNITY & ANTI-RETALIATION

### 14.1 No Retaliation Guarantee

Funding Parties expressly agree not to retaliate against artists, staff, or whistleblowers seeking Vault or DoD mediation.

### 14.2 Sovereign Mediation Priority

Before issuing threats or blacklisting, the parties must offer **Sovereign Mediation**. Positive adherence is tracked in the Equity-for-Artists Index.

### 14.3 Artist Mortality Incentive Ban (Anti-Death Profiteering)

- **Life Worth Index™**: Incentivizes living-artist support, discourages posthumous profiteering.

- **Advance-on-Life Programs**: At least 3% of catalog exploitation profits support mental health and emergency assistance for living artists.

64

**14.4 Community of Care Activation**

Each Sovereign Program must include crisis lines, family education resources, and peer-led mental health networks.

**14.5 Breach Penalty for Retaliation**

Any retaliation verified against an artist who sought DoD protection triggers immediate material breach and public disclosure of evidence per Section 10.2.

---

## 15. ALLOWABLE CONCESSIONS VS. NON-NEGOTIABLES

### 15.1 Allowable Concessions

- **Visibility / Co-branding**: Limited public mention of your involvement, subject to your approval.

- **Guest Feature Pitches**: Proposals for collaborations at your sole discretion.

- **Strategic Appearances**: Summits or panels only if aligned with DoD objectives.

- **Innovative Partnerships**: Tech or AI alignments requiring DoD's artist sovereignty principle.

- **Profit-Sharing Co-Ventures**: Potential for real estate or venue ownership, with your 51% controlling stake.

- **Regulatory Guidance**: Advisory role if Funding Parties openly admit systemic failings.

- **Contingent Silence**: Your vow of discretion remains optional, dependent on compliance.

### 15.2 Non-Negotiables (Deal-Breakers)

- **Full DoD Sovereignty**: No parallel boards or frameworks.

- **No Gag Orders**: Your autonomy to speak is never bargained away.

- **Narrative Control**: You retain final say on public portrayals.

65

- **Vault Ownership**: Sole directive authority over all Vault assets.

- **Trigger Clause**: Breach unleashes full data disclosures.

- **Anti-Retaliation Enforcement**: Zero tolerance for any punitive measures.

- **Life Worth Index**: Prioritizing living artists is mandatory.

- **Credit & IP Protection**: Your IP remains untouchable.

- **Whistleblower Coverage:** Absolute protection for truth-tellers.

- **No Cultural Death Profiteering**: Funding must support living creators, not posthumous exploitation.

- **Algorithmic Transparency**: DSPs refusing audit logs lose DoD licensing.

- **Generational Continuity**: Successors inherit enforcement authority indefinitely.

---

## 16. ADVANCED CLAUSES & LOOPHOLE LOCKS

### 16.1 Algorithmic Kill Switch

If any algorithm is proven to suppress or misrepresent streams, DoD may suspend that Party's access to playlisting and recommendation systems.

### 16.2 Metadata Reclamation

You retain the right to correct metadata across all DSPs and label archives, requiring future usage to match the updated records.

### 16.3 Silent Observer Clause

You or your representatives may attend relevant internal meetings of the Funding Parties without obligation to respond or participate.

### 16.4 Derivative Moratorium



No derivative works (remixes, AI clones) based on DoD-affiliated IP for **twenty (20) years** without a newly negotiated license.

**16.5 No Optics Clause**

All philanthropic or self-corrective measures by Funding Parties remain confidential unless you authorize public disclosure.

---

## 17. COMMON LANGUAGE TRAPS & COUNTERMEASURES

- **"In Good Faith"** → Replace with **measurable KPIs** and deadlines.

- **"Commercially Reasonable Efforts"** → Must match or exceed top-ten historical priorities.

- **"Including but not limited to…"** → Restrict expansions to explicitly listed categories unless otherwise approved.

- **"Non-Assignable Proceeds"** → Demand "Direct Attribution of Revenue Streams."

- **"Pro-Rata Payout"** → Require "User-Centric Payout Enforcement."

- **"Perpetual Non-Exclusivity"** → Use a "Single-License Access Provision."

- **"Marketing Contribution Matching"** → Insist on "Non-Recoupable Partnership" to avoid hidden artist debt.

- **"Moral Rights Waiver"** → Insert "Creative Integrity Retention Clause."

- **"Most Favored Nations (MFN)"** → Govern only via a "DoD-Only MFN Control Clause."

---

## 18. DOCUMENTATION & REPORTING

**18.1 Quarterly Social Docket**

67

Funding Parties submit a confidential report of all social impact activities each quarter. Public announcements require **DoD** approval.

## 18.2 Equity-for-Artists Index Report

Published bi-annually, rating the Funding Parties on living-artist support, mental health measures, prison rehabilitation, and anti-retaliation efforts.

## 19. FINAL STATEMENT & SIGNATURE

    **"This is not a settlement. This is a Sovereign Infrastructure Act.**
     **You're not paying me to be silent; you're funding what you failed to build.**
     **Breach, and the world sees it all.**
     **Honor it, and together we rewrite the future—on our terms."**

**SOVEREIGN ARCHITECT (YOU)**
Name: _____
Date: _____

**AUTHORIZED REPRESENTATIVE (FUNDING PARTY)**
Name: _____
Title: _____
Entity: _____
Date: _____

## 20. MISCELLANEOUS PROVISIONS

### 20.1 Governing Law & Jurisdiction

This Agreement shall be governed by the laws of the **State of South Dakota**, without regard to its conflict-of-law principles. All disputes arising under or relating to this Agreement shall be adjudicated **exclusively** in courts of competent jurisdiction located in South Dakota.

### 20.2 Dispute Resolution (Arbitration)

All disputes not otherwise resolved shall be settled through **confidential, binding arbitration** under the rules of the American Arbitration Association (AAA). The arbitration shall occur in **Sioux Falls, South Dakota**, with costs borne by the breaching Funding Party.

68

## 20.3 Liquidated Damages

Any intentional breach involving **retaliation, unauthorized metadata manipulation, algorithmic suppression,** or **IP infringement** triggers **liquidated damages** equal to **[X%] of the breaching Funding Party's gross annual revenue** from the previous fiscal year, payable directly to the **Sovereign Vault Trust**.

## 20.4 Force Majeure

Neither party shall be liable for delays or failures caused by events beyond their reasonable control, excluding **economic downturns, foreseeable industry shifts, or internal administrative complications**. Written notice must be provided immediately, and efforts to resume performance shall be prompt.

## 20.5 Non-Waiver

No omission or delay in exercising any right or remedy shall waive future enforcement of any term. A waiver is valid only if it is explicitly documented in writing and signed by the waiving party.

## 20.6 Severability

If any provision is held invalid or unenforceable, that provision shall be severed, and the remainder of this Agreement shall continue in full force and effect. The parties agree to negotiate a valid, substitute clause mirroring the intent of the original.

## 20.7 Regulatory Compliance

All Funding Party actions, investments, and disclosures under this Agreement must comply with **IRS, SEC, FTC, DOJ,** and any other relevant federal or state regulations, including antitrust statutes.

## 20.8 Successors & Assigns

This Agreement binds and inures to the benefit of the parties and their respective successors, assigns, subsidiaries, affiliates, or resultant entities via merger or consolidation. Obligations automatically transfer, ensuring the perpetual enforceability of these reforms.

---

## ANNEX A: KEY DEFINITIONS

69

- **Dreams Over Dollars™ (DoD)**: Umbrella organization directing all reforms, brand usage, and investment protocols.

- **Vault Trust**: The South Dakota trust that receives all financial contributions. You control its directives; no co-ownership exists.

- **Trigger Clause (Reverse NDA)**: Grants immediate right to disclose sensitive data if Funding Parties materially breach.

- **Metadata Justice**: Requirement for transparent crediting and accounting of all creative contributions.

- **Life Worth Index™**: Score measuring Funding Parties' commitment to living-artist support.

- **User-Centric Payout**: Payment model proportional to each user's actual consumption rather than total market share.

- **AI/Metadata Non-Replication**: Prohibits training AI models on or scraping your IP and frameworks without a new, explicit license.

- **Material Breach**: Any act that substantially undermines the Agreement's core purpose—especially retaliation, metadata manipulation, IP infringement, or transparency failures.

- **Immediate Disbursement**: Funds to be transferred directly to the Vault without escrow or extended holding periods.

- **Funding Parties**: All parent companies, subsidiaries, and affiliates bound by the obligations here.

- **Gross Annual Revenue**: The top-line revenue from the prior fiscal year, before deductions.

**[END OF ENHANCED MASTER SETTLEMENT]**

71

More Than Rich™          NFT licensing oversight, brand usage

Future Inventions        Patent searches, filings, enforcement

App/Platform Designs     Copyright, UI/UX protections, backend IP

Music Metadata Systems   Method patents (algorithmic scoring, credit indexing)

## 13.2 Legacy IP Retention Guarantee

No Funding Party shall claim or attempt to dilute controlling interest in your IP. Violation triggers **Section 10.2**.

72

### 14.4 Community of Care Activation

Each Sovereign Program must include crisis lines, family education resources, and peer-led mental health networks.

### 14.5 Breach Penalty for Retaliation

Any retaliation verified against an artist who sought DoD protection triggers immediate material breach and public disclosure of evidence per Section 10.2.

---

## 15. ALLOWABLE CONCESSIONS VS. NON-NEGOTIABLES

### 15.1 Allowable Concessions

- **Visibility / Co-branding**: Limited public mention of your involvement, subject to your approval.

- **Guest Feature Pitches**: Proposals for collaborations at your sole discretion.

- **Strategic Appearances**: Summits or panels only if aligned with DoD objectives.

- **Innovative Partnerships**: Tech or AI alignments requiring DoD's artist sovereignty principle.

- **Profit-Sharing Co-Ventures**: Potential for real estate or venue ownership, with your 51% controlling stake.

- **Regulatory Guidance**: Advisory role if Funding Parties openly admit systemic failings.

- **Contingent Silence**: Your vow of discretion remains optional, dependent on compliance.

### 15.2 Non-Negotiables (Deal-Breakers)

- **Full DoD Sovereignty**: No parallel boards or frameworks.

- **No Gag Orders**: Your autonomy to speak is never bargained away.

- **Narrative Control**: You retain final say on public portrayals.

73

- **Vault Ownership**: Sole directive authority over all Vault assets.

- **Trigger Clause**: Breach unleashes full data disclosures.

- **Anti-Retaliation Enforcement**: Zero tolerance for any punitive measures.

- **Life Worth Index**: Prioritizing living artists is mandatory.

- **Credit & IP Protection**: Your IP remains untouchable.

- **Whistleblower Coverage**: Absolute protection for truth-tellers.

- **No Cultural Death Profiteering**: Funding must support living creators, not posthumous exploitation.

- **Algorithmic Transparency**: DSPs refusing audit logs lose DoD licensing.

- **Generational Continuity**: Successors inherit enforcement authority indefinitely.

## 16. ADVANCED CLAUSES & LOOPHOLE LOCKS

### 16.1 Algorithmic Kill Switch

If any algorithm is proven to suppress or misrepresent streams, DoD may suspend that Party's access to playlisting and recommendation systems.

### 16.2 Metadata Reclamation

You retain the right to correct metadata across all DSPs and label archives, requiring future usage to match the updated records.

### 16.3 Silent Observer Clause

You or your representatives may attend relevant internal meetings of the Funding Parties without obligation to respond or participate.

### 16.4 Derivative Moratorium

No derivative works (remixes, AI clones) based on DoD-affiliated IP for **twenty (20) years** without a newly negotiated license.

**16.5 No Optics Clause**

All philanthropic or self-corrective measures by Funding Parties remain confidential unless you authorize public disclosure.

---

## 17. COMMON LANGUAGE TRAPS & COUNTERMEASURES

- **"In Good Faith"** → Replace with **measurable KPIs** and deadlines.

- **"Commercially Reasonable Efforts"** → Must match or exceed top-ten historical priorities.

- **"Including but not limited to…"** → Restrict expansions to explicitly listed categories unless otherwise approved.

- **"Non-Assignable Proceeds"** → Demand "Direct Attribution of Revenue Streams."

- **"Pro-Rata Payout"** → Require "User-Centric Payout Enforcement."

- **"Perpetual Non-Exclusivity"** → Use a "Single-License Access Provision."

- **"Marketing Contribution Matching"** → Insist on "Non-Recoupable Partnership" to avoid hidden artist debt.

- **"Moral Rights Waiver"** → Insert "Creative Integrity Retention Clause."

- **"Most Favored Nations (MFN)"** → Govern only via a "DoD-Only MFN Control Clause."

---

## 18. DOCUMENTATION & REPORTING

**18.1 Quarterly Social Docket**

75

Funding Parties submit a confidential report of all social impact activities each quarter. Public announcements require **DoD** approval.

### 18.2 Equity-for-Artists Index Report

Published bi-annually, rating the Funding Parties on living-artist support, mental health measures, prison rehabilitation, and anti-retaliation efforts.

---

## 19. FINAL STATEMENT & SIGNATURE

> **"This is not a settlement. This is a Sovereign Infrastructure Act.**
> **You're not paying me to be silent; you're funding what you failed to build.**
> **Breach, and the world sees it all.**
> **Honor it, and together we rewrite the future—on our terms."**

### SOVEREIGN ARCHITECT (YOU)

Name: _____

Date: _____

### AUTHORIZED REPRESENTATIVE (FUNDING PARTY)

Name: _____

Title: _____

Entity: _____

Date: _____

---

## 20. MISCELLANEOUS PROVISIONS

### 20.1 Governing Law & Jurisdiction

This Agreement shall be governed by the laws of the **State of South Dakota**, without regard to its conflict-of-law principles. All disputes arising under or relating to this Agreement shall be adjudicated **exclusively** in courts of competent jurisdiction located in South Dakota.

### 20.2 Dispute Resolution (Arbitration)

All disputes not otherwise resolved shall be settled through **confidential, binding arbitration** under the rules of the American Arbitration Association (AAA). The arbitration shall occur in **Sioux Falls, South Dakota**, with costs borne by the breaching Funding Party.

76

### 20.3 Liquidated Damages

Any intentional breach involving **retaliation, unauthorized metadata manipulation, algorithmic suppression,** or **IP infringement** triggers **liquidated damages** equal to **[X%] of the breaching Funding Party's gross annual revenue** from the previous fiscal year, payable directly to the **Sovereign Vault Trust**.

### 20.4 Force Majeure

Neither party shall be liable for delays or failures caused by events beyond their reasonable control, excluding **economic downturns, foreseeable industry shifts, or internal administrative complications**. Written notice must be provided immediately, and efforts to resume performance shall be prompt.

### 20.5 Non-Waiver

No omission or delay in exercising any right or remedy shall waive future enforcement of any term. A waiver is valid only if it is explicitly documented in writing and signed by the waiving party.

### 20.6 Severability

If any provision is held invalid or unenforceable, that provision shall be severed, and the remainder of this Agreement shall continue in full force and effect. The parties agree to negotiate a valid, substitute clause mirroring the intent of the original.

### 20.7 Regulatory Compliance

All Funding Party actions, investments, and disclosures under this Agreement must comply with **IRS, SEC, FTC, DOJ,** and any other relevant federal or state regulations, including antitrust statutes.

### 20.8 Successors & Assigns

This Agreement binds and inures to the benefit of the parties and their respective successors, assigns, subsidiaries, affiliates, or resultant entities via merger or consolidation. Obligations automatically transfer, ensuring the perpetual enforceability of these reforms.

---

## ANNEX A: KEY DEFINITIONS

77

- **Dreams Over Dollars™ (DoD)**: Umbrella organization directing all reforms, brand usage, and investment protocols.

- **Vault Trust**: The South Dakota trust that receives all financial contributions. You control its directives; no co-ownership exists.

- **Trigger Clause (Reverse NDA)**: Grants immediate right to disclose sensitive data if Funding Parties materially breach.

- **Metadata Justice**: Requirement for transparent crediting and accounting of all creative contributions.

- **Life Worth Index™**: Score measuring Funding Parties' commitment to living-artist support.

- **User-Centric Payout**: Payment model proportional to each user's actual consumption rather than total market share.

- **AI/Metadata Non-Replication**: Prohibits training AI models on or scraping your IP and frameworks without a new, explicit license.

- **Material Breach**: Any act that substantially undermines the Agreement's core purpose—especially retaliation, metadata manipulation, IP infringement, or transparency failures.

- **Immediate Disbursement**: Funds to be transferred directly to the Vault without escrow or extended holding periods.

- **Funding Parties**: All parent companies, subsidiaries, and affiliates bound by the obligations here.

- **Gross Annual Revenue**: The top-line revenue from the prior fiscal year, before deductions.

---

**[END OF ENHANCED MASTER SETTLEMENT]**

78

EXHIBIT AD

# LEGAL-HISTORICAL REPORT: ARTIST RIGHTS LITIGATION & SYSTEMIC METADATA SUPPRESSION

*Submitted in support of Rule 27 Petition / Motion for Judicial Notice / Constructive Trust Theory*

## I. LEGAL PURPOSE & SCOPE

This exhibit is submitted to demonstrate a sustained historical pattern of artist exploitation, metadata suppression, and systemic retaliation against rights assertion. Petitioner offers this report as factual foundation and legal context for claims involving:

- Constructive trust formation

- Algorithmic suppression

- Metadata laundering

- Reversion right obstruction

- AI-authorship infringement

- Market manipulation and access gatekeeping

---

## II. STRUCTURAL HISTORY OF EXPLOITATION

| Era | Mechanism of Harm | Artist Resistance | Systemic Outcome |
|---|---|---|---|
| 1920s–40s | Race records, no royalties, erased credit | Unionization, cultural preservation | Cultural erasure; no reparations |
| 1950s–60s | Payola, stolen publishing, white intermediaries | Negotiated master control (e.g., Ray Charles) | First ownership deals emerge |
| 1970s–90s | Sampling theft, predatory contracts | Public bankruptcies, protest (e.g., Prince) | Awareness rise, weak legal reforms |
| 2000s–2010s | Metadata obfuscation, unlicensed streaming | Class actions, audit demands | Music Modernization Act (MMA) – structurally flawed |
| 2020s | AI cloning, catalog retaliation, algorithmic bias | Re-recordings, lawsuits, Rule 27 filings | Live litigation, metadata sovereignty emerging |

## III. HISTORIC CASES AND ARTIST CLAIMS

### A. Early 20th Century (Precedent Without Remedy)

- **Bessie Smith** – Best-selling Columbia artist, died without royalty protections; exploited via "race records."

80

- **Sister Rosetta Tharpe** – Guitar pioneer; never credited for rock-gospel hybrid innovations.

- **Ma Rainey** – Recorded for Paramount; underpaid and erased from authorship history.

## B. 1950s–1970s (Publishing & Performance Theft)

- **Chuck Berry** – Coerced into giving co-writing credit for "Maybellene" to a DJ for airplay.

- **Little Richard** – Signed away rights for flat fees; legacy monetized by others.

- **Ray Charles** – First major artist to negotiate ownership of master recordings (ABC Records, 1960).

- **James Brown / George Clinton** – Subject to extensive sampling with no early compensation.

## C. 1980s–1990s (Resistance Via Bankruptcy and Protest)

- **TLC** – Filed bankruptcy despite multi-platinum sales; spoke publicly on recoupment fraud.

- **Prince** – Protested contract slavery via name change; wrote "SLAVE" on his face; later reclaimed masters.

- **De La Soul** – Locked out of DSPs due to uncleared samples for 20+ years.

81

## IV. MODERN CASE LAW & ACTIVE LITIGATION

| Case | Plaintiff | Defendant | Core Legal Issue | Filed |
|------|-----------|-----------|------------------|-------|
| *Lowery v. Spotify* | David Lowery | Spotify | Mechanical royalty theft | 2015 |
| *Ferrick v. Spotify* | Melissa Ferrick | Spotify | Statutory license violations | 2016 |
| *Eight Mile Style v. Spotify* | Eminem's publisher | Spotify | Streaming unlicensed tracks | 2019 |
| *Four Tet v. Domino* | Kieran Hebden | Domino Records | Streaming royalty dispute | 2020 |
| *Schneider v. YouTube* | Maria Schneider | YouTube | Discriminatory access to ContentID | 2020 |
| *Taylor Swift v. Big Machine (non-lit)* | Taylor Swift | Big Machine | Masters sold without consent | 2019–2021 |
| *Salt-N-Pepa v. UMG* | Cheryl James, Sandra Denton | UMG | Catalog removal post-termination notice | 2025 |
| *RIAA et al. v. Suno & Udio* | Sony, UMG, Warner | AI startups | Unauthorized AI training on catalog | 2024 |

82

| *Reyna v. Spotify* | Joseph Reyna (JoeCat®) | Spotify | Metadata laundering, constructive trust | 2025 |
| --- | --- | --- | --- | --- |
| *Reyna v. UMG* | Joseph Reyna (JoeCat®) | UMG | Algorithmic retaliation, authorship suppression | 2025 |
| *Reyna v. Google LLC* | Joseph Reyna (JoeCat®) | Google | Nonprofit fraud, forced billing, Ad Grant interference | 2025 |

---

## V. LEGAL PATTERNS & SYSTEMIC FAILURE

### 1. Metadata Dispossession

Missing, altered, or deliberately obscured metadata prevents royalty attribution, damages claimable authorship, and obstructs legal remedies. (See: *Reyna v. Spotify*, *Eight Mile Style v. Spotify*)

### 2. Reversion Rights Retaliation

Artists like Salt-N-Pepa are delisted after issuing 35 U.S.C. § 203 notices—direct retaliation for reclaiming legal authorship.

### 3. Algorithmic Suppression

Discovery Mode and similar tools privilege pay-for-access over merit or authorship, embedding commercial bias into visibility systems. (*Schneider v. YouTube*, *Reyna v. UMG*)

83

**4. Synthetic Training Without Consent**

Labels and AI platforms profit from unauthorized voice cloning and catalog ingestion. (*RIAA v. Suno/Udio, Reyna Rule 27 Petition (proposed)*)

**5. Constructive Trust Violations**

Streaming platforms and AI companies knowingly profit from misattributed or stolen metadata, triggering equitable doctrines of restitution and trust formation. (*Reyna v. Spotify*)

---

## VI. SUPPORTING EXHIBITS

To be filed concurrently or integrated by reference:

- **Exhibit A** – Timeline of Exploitation (1920s–2025)

- **Exhibit B** – Case Filings & Court Dockets (PACER citations)

- **Exhibit C** – Summary of Metadata Erasure Events (Spotify, YouTube)

- **Exhibit D** – Public Statements by Artists (TLC, Prince, Swift, Clinton)

- **Exhibit E** – MMA Structural Flaws and Critiques

- **Exhibit F** – FOIA Responses, FinCEN TCRs, and Industry Silence Patterns

---

## VII. CONCLUSION

This legal-historical record establishes a factual and cultural pattern of:

- Exploitation by systemic design

- Suppression through metadata control

- Retaliation against rights assertion

- Legal asymmetry sustained through procedural evasion

**Petitioner submits this as judicial notice under FRE 201 and in support of claims grounded in copyright, equity, ADA protections, RICO frameworks, and public interest litigation.**

---

Respectfully submitted,

**Joseph Anthony Reyna**
Petitioner, Pro Se
Registered Trademark Holder: JOECAT® (USPTO Reg. No. 6,057,783)
Nonprofit Director: Dreams Over Dollars™ (501(c)(3))
Email: whitehat@joecattt.com
Address: 5900 Balcones Dr. #16077, Austin, TX 78731

Date: August 7, 2025

85

## EXHIBIT I

### University of Houston x Universal Production Music Blanket License Agreement

**Filed in Support of:**

Verified Petition for Rule 27 Pre-Suit Discovery and Metadata Preservation

**Date of Agreement:** Unknown (Redacted copy obtained via FOIA)

**Key Subject:** Public university license executed with UMG subsidiary for passive metadata ingestion and back-end rights automation

**Prepared By:**

Joseph Anthony Reyna (JoeCat®)

Pro Se Petitioner

Founder, Dreams Over Dollars™

Registered Trademark Holder: JOECAT® (USPTO Reg. No. 6,057,783)

86

# PURCHASE ORDER

## Contracts - UH
5000 GULF FREEWAY  BUILDING 1  ROOM 136
HOUSTON TX 77204-0900
USA

| Purchase Order | | Date | Revision | Page |
|---|---|---|---|---|
| CN730 - 0000020257 | | 11/21/2024 | | 1 |
| Payment Terms | | Freight Terms | | Ship Via |
| Net 30 | | Destination | | COMMON |
| Buyer  0875201  Cabiran,Eric M | | | Fiscal year: 2025 | |

UNIVERSAL MUSIC - MBG NA LLC
15044 Collection Center Dr
Chicago IL 60693-0150
USA

Ship To:   4343 ELGIN  3RD FL
            HOUSTON, TX, TX
            USA

Bill To:   4343 ELGIN  3RD FL
           HOUSTON, TX. 77204-0887
           USA

Vendor:  0000061340      PO Type: Sole Source
Fax:                     Phone:                          Contact: GINA EAST

| Line-achd | Item | Description | Quanity | | UOM | PO Price | Extended Amt | | Due Date |
|---|---|---|---|---|---|---|---|---|---|
| 1  - 1 | | BROADCAST FEES FOR MUSIC LIBRARY AND SFX LICENSE | 1.00 | | EA | 10,545.00 | 10,545.00 | | 12/31/2026 |

KUHF-RADIO

PRICING, TERMS AND CONDITIONS PER CONTRACT: INTERNAL CONTRACT NO.: HPM24-0010

CONTRACT TERM: 12/14/2023 - 12/13/2026

BILLING/ DELIVERY CONTACT: TAMIKA SIMONS, 7137430685, TSIMONS2@CENTRAL.UH.EDU

UNIVERSITY OF HOUSTON INVOICING STANDARDS MUST BE FOLLOWED. THESE STANDARDS ARE LOCATED AT:
WWW.UH.EDU/PURCHASING AND CAN BE FOUND BY CLICKING ON VENDOR RESOURCES.

| | Total PO Amount | $10,545.00 |
|---|---|---|

STATE SALES TAX EXEMPTION CERTIFICATE: Procurement process is authorized by Education Code 51.9335.
The undersigned claims an exemption from taxes under Chapter 20,Title 122A Revised Civil Statutes of Texas for purchase of
tangible personal property described in this numbered order, purchase from contractor and/or shipper listed above, as this
property is being secured for the exclusive use of the State of Texas.
Contracts - UH  IS AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER

Robert Adkins, Purchasing Director

87

Case 1:25-cv-06779-LLS    Document 1    Filed 08/14/25    Page 89 of 124

Account # KT031291



# UNIVERSAL

## UNIVERSAL PRODUCTION MUSIC

### BROADCAST BLANKET AGREEMENT
### *Master and Synchronization License*

This Master Recording & Synchronization License Agreement and the attached UH Standard Contract Addendum (the "UH ADDENDUM"), attached hereto and incorporated herein by this reference (collectively, the "Agreement"), entered into **September 8, 2023** between **Universal Production Music, a unit of Universal Music – MGB NA LLC,** 2105 Colorado Avenue, Santa Monica, CA 90404 (hereafter referred to as "UPM"), and **University of Houston,** *signatory for, and solely on behalf of,* **Houston Public Media,** 4343 Elgin, Houston, TX 77204-0008 (hereafter referred to as "COMPANY").

1.     For purposes of this Agreement, the following terms shall be defined as follows:

(a)     **Works:**                 The musical composition(s) and sound recording(s) thereof (as updated from time-to-time) as set forth on https://www.universalproductionmusic.com/en-us/licensing/label-packages.

(b)     **Production(s):**         Unlimited number of audio-visual productions embodying the Works created, developed and/or produced in-house or out-of-house solely for COMPANY-owned productions during the Synch Term.

(c)     **Synch Term:**           **Three (3) Years,** commencing on **December 14, 2023** and ending on **December 13, 2026.**

(d)     **Exploitation Term:**    In perpetuity, subject to paragraph 2 below.

(e)     **License Fee:**          **Thirty-One Thousand Six Hundred Thirty-Five US Dollars ($31,635.00),** which includes the fee for SFX (defined below) and is payable in accordance with the Payment Schedule.

(f)     **Payment Schedule:**     **One (1) payment of Ten Thousand Five Hundred Forty-Five US Dollars ($10,545.00)** is due within thirty (30) days of the signing and execution of this Agreement, followed by **Two (2) Annual payments of Ten Thousand Five Hundred Forty-Five US Dollars ($10,545.00)** due on or before **December 14, 2024** and **December 14, 2025,** respectively.

(g)     **Territory:**            COMPANY's DMA as defined by Nielsen/Arbitron as it relates to synchronization and exploitation (except as otherwise provided in each applicable Clearance in paragraph 1(h) below).

(h)     **Clearance(s):**         • **TV BROADCAST –** Local commercials, promos, infomercials, and PSA's limited to Houston area; programming including episodes and themes, and news, including themes.

                                  • **RADIO BROADCAST –** National programming, news, commercials, promos, infomercials, and PSA's. Includes episodic / series productions and themes. For purpose of this "Radio Broadcast" Clearance, the Territory is considered to be the United States.

                                  • **NON-BROADCAST –** COMPANY's non-broadcast, in-house use.

                                  • **DIGITAL / ONLINE / STREAMING / SOCIAL (ORGANIC NON-PAID) -** Free digital downloads / streaming. Includes episodic / series productions and themes. For purpose of this "Digital (Non-Paid) Clearance", the Territory is considered to be the World.

88

distribution of any existing Productions. Notwithstanding any such termination, UPM shall have the right to retain as its property all sums paid by COMPANY to UPM hereunder, free of any claim by COMPANY.

6.     Confidentiality.  UPM and COMPANY shall keep confidential and not disclose to any third party the terms of this Agreement without the prior written consent of the other, except that: (a) the terms hereof may be disclosed, on a confidential basis, to the respective party's employees, attorneys and accountants; (b) the terms may be disclosed in any discovery proceedings related to the lawsuits filed by or against the disclosing party, provided that commercially reasonable efforts will be made by the disclosing party to require that the terms of the Agreement be maintained as confidential; and (c) the terms may be disclosed to the extent necessary to comply with any applicable law, court order or inquiry by a taxing authority, provided that commercially reasonable efforts will be made by the disclosing party to require that the terms of the Agreement be maintained as confidential.

7.     Miscellaneous.

     (a)     This Agreement is intended by the parties hereto (i) to be the final expression of their agreement and understanding with respect to the subject matter hereof and as a complete and exclusive statement of the terms thereof, and (ii) to supersede any and all prior and contemporaneous agreements and undertakings of the parties, whether oral or written, relating thereto. Each of the parties hereto hereby acknowledges and agrees that neither party has made any representation or promise in connection with this Agreement or the subject matter hereof not contained herein.

     (b)     No waiver by either party of any term of this Agreement or any default hereunder shall affect such party's right thereafter to enforce such term or to exercise any right or remedy in the event of any other default, whether or not similar.

     (c)     If any part of this Agreement is determined to be void, invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, the remainder of this Agreement shall continue in full force and effect.

     (d)     This Agreement shall be governed by and construed in accordance with the Laws of the State of Texas and the jurisdiction of any dispute hereunder shall be with the United States Court, located in Houston, Texas.

     (e)     Neither party hereto may assign, in whole or in part, any of its rights or obligations under this Agreement without the prior written consent of the other party, except that no such consent shall be required in connection with a merger, reorganization or sale of all, or substantially all of such party's assets.

     (f)     The headings of paragraphs or other divisions hereof are inserted only for the purpose of convenient reference and shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning, intent or construction of any of the terms, provisions, covenants and conditions of this Agreement, nor shall they otherwise be given any legal effect.

[SIGNATURE PAGE FOLLOWS.]

HPM24-0010

Form No. OGC-S-2009-01

# Standard Contract Addendum

This Standard Contract Addendum ("Addendum") is between the University of Houston entity/campus indicated in the signature block below ("University") and the other party indicated in the signature block ("Contracting Party") and is incorporated by reference into the attached contract entitled <u>Universal Production Music Broadcast Blanket Agreement</u> and numbered K-<u>T031291</u> between University and Contracting Party (the "Agreement"). University and Contracting Party may be referred to singularly as a "Party" and collectively as the "Parties." Notwithstanding anything in the Agreement to the contrary, if there is any conflict or contradiction between the provisions of the Agreement and those in this Addendum, this Addendum will control and Contracting Party waives any claim to the contrary.

1. **Payment Terms.** Payment terms for amounts due from University to Contracting Party under the Agreement (including due dates and late fees) are governed by Chapter 2251 of the Texas Government Code.

2. **Representations by Contracting Party.** If Contracting Party is a business entity, it represents that: (i) it is duly organized, validly existing and in good standing under the laws of the state of its organization; (ii) it is authorized and in good standing to conduct business in the State of Texas; (iii) it has all necessary power and has received all necessary approvals to execute and perform its obligations in the Agreement; and (iv) the individual executing the Agreement and this Addendum on behalf of Contracting Party is authorized to do so.

3. **Eligibility to Receive Payment.** In accordance with Section 231.006 of the Texas Family Code and Sections 2155.004 and 2155.006 of the Texas Government Code, Contracting Party certifies that it is not ineligible to receive the Agreement and payments under the Agreement and acknowledges that University may terminate the Agreement and/or withhold payment if this certification is inaccurate.

4. **Payment of Debt/Delinquency to the State.** Contracting Party certifies that it is not indebted to the State of Texas and is current on all taxes owed to the State of Texas. Any payments owed to Contracting Party under the Agreement may be applied directly toward any debt or delinquency that Contracting Party owes the State of Texas or any agency of the State of Texas regardless of when it arises, until such debt or delinquency is paid in full. [Texas Government Code, Sections 2107.008 and 2252.903]

5. **Tax Exemption.** University will not be required to pay any taxes for which it can demonstrate an exemption.

6. **Breach of Contract Claims.** To the extent Chapter 2260 of the Texas Government Code is applicable to the Agreement and not preempted by other law, the dispute resolution process provided for in Chapter 2260 and the rules adopted by the Texas Attorney General (currently at 1 Texas Administrative Code, Part 3 Chapter 68) will be used by the Parties to attempt to resolve any claim for breach of contract made by Contracting Party against University that cannot be resolved in the ordinary course of business. Except as otherwise provided by law, nothing herein is a waiver by University or the State of Texas of the right to seek redress in a court of law.

7. **Travel Expenses.** If the Agreement requires University to reimburse Contracting Party for travel expenses, Contracting Party shall invoice all requests for reimbursement in accordance with the State of Texas travel, meal and lodging reimbursement guidelines applicable to State of Texas employees.

8. **Risk of Loss.** All work performed by Contracting Party pursuant to the Agreement will be at Contracting Party's exclusive risk until final and complete acceptance of the work by University. In the case of any loss or damage to the work prior to University's acceptance, such loss or damage will be Contracting Party's responsibility. Delivery of any goods to University pursuant to the Agreement must be FOB destination.

9. **Insurance.** University has limited liability pursuant to the Texas Civil Practice and Remedies Code, and opts to self-fund for items that University becomes legally liable for. Prior to commencing performance of its obligations under the Agreement, Contracting Party shall maintain on a primary basis, at its sole expense, General Liability insurance coverage in an amount of no less than $1,000,000 per occurrence. If Contracting Party will enter University property during the term of the Agreement, then it shall also maintain the following insurance: (i) Workers' Compensation coverage as required by law with statutory limits for the State of Texas, including Employers Liability coverage with minimum liability limits of $1,000,000 bodily injury each accident, $1,000,000 bodily injury by disease policy limit, and $1,000,000 bodily injury by disease per each employee; and (ii) Commercial Automobile Liability in an amount of no less than $1,000,000 Combined Single Limit. In the event Contracting Party does not own automobiles, it agrees to maintain coverage for Hired & Non-Owned Auto Liability. All policies must contain a waiver of subrogation endorsement in favor of University. General Liability and Commercial Automobile Liability policies must name University as an Additional Insured. Contracting Party shall provide Certificates of Insurance evidencing these insurance requirements prior to the start of work under the Agreement. University reserves the right to review and allow deviations or waivers of these insurance requirements with review and written approval of authorized personnel in the University of Houston's Risk Management Department. University reserves the right to require additional insurance coverages or amend the limits outlined above at its sole discretion.

10. **Products and Materials Produced in Texas.** If Contracting Party provides services under the Agreement, Contracting Party shall, in performing its obligations under the Agreement, purchase products and materials

90

HPM24-0010

**Form No. OGC-S-2009-01**

terrorism; disasters; riots; rebellions; strikes or other labor disputes; civil disorder; epidemics, pandemics, such as COVID-19 or any disease having a similar effect; any other national or regional emergency; curtailment of transportation facilities beyond the Parties' control; or any other cause not enumerated herein but which is beyond the reasonable control of the Party whose performance is affected and which makes it illegal, impossible, or impracticable for such Party to perform its duties and obligations under the Agreement (collectively, a "Force Majeure Event"). A Party may suspend performance of the Agreement during the occurrence of a Force Majeure Event if it is unable in good faith to perform its duties and obligations under the Agreement due to that Force Majeure Event. Additionally, if a Force Majeure Event lasts longer than thirty (30) continuous days then the Agreement may be terminated by the Party affected by such a Force Majeure Event, provided however, that the Parties are liable for and shall be required to perform the duties and obligations that arose prior to such Force Majeure Event.

26. **No Fraud Violations.** Contracting Party affirms that it has not been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds and that it does not employ officers or employees that have been convicted of, or pled *nolo contendere* or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds.

27. **Foreign National Information Addendum.** Contracting Party must check the appropriate box. The Contracting Party **IS NOT BOTH** an **individual** and a **Foreign National** (i.e., is not a U.S. Citizen or U.S. Resident Alien) ☑ or the Contracting Party **IS BOTH** an **individual** and a **Foreign National** ☐. A Contracting Party who is **BOTH** an individual and a Foreign National must complete the Foreign National Information Addendum located on the University of Houston website (http://www.uh.edu/legal-affairs/contract-administration/contract-documents/amendments-addenda/) and submit it with the Agreement and this Addendum to the University. This information is required to ensure that the Contracting Party is eligible to receive payment and that the correct tax withholding, if any, is applied to that payment. The Foreign National Addendum must be submitted to the University at least three weeks before services will be performed under this Agreement. Contracting Parties who are not individuals and Foreign Nationals are not required to attach the Foreign National Information Addendum to the Agreement and this Addendum.

28. **Compliance.** Contracting Party shall observe and abide by all applicable local, state and federal laws (including without limitation the Jeanne Clery Act), regulations and University policies and procedures.

29. **Electronic Delivery.** Execution and delivery of the Agreement by exchange of email or fax copy bearing the signature of a Party will constitute a valid and binding execution and delivery of the Agreement by such Party.

| **UNIVERSITY:** | **CONTRACTING PARTY:** |
|---|---|
| UH Entity/Campus: University of Houston | Party Name: Universal Music-MGB NA LLC d/b/a Universe Production Music |
| Signature: _J 7 Clm_ | Signature: _Jeffery AE shbaugh_ |
| Printed Name: Josh Adams | Printed Name: Jeffery Eshbaugh |
| Title: Station Manager | Title: Authorized Signatory |
| Date: 11/6/2023 | Date: 10/30/2023 |

*Note: Modification of This Form Requires Written Approval of the University of Houston's Office of General Counsel*

91

## EXHIBIT II
### Payola by Design: The Promo Cartel — Metadata Laundering and Algorithmic Sabotage
**Filed in Support of:** Verified Petition for Rule 27 Pre-Suit Discovery and Metadata Preservation
**Author:** Joseph Anthony Reyna (JoeCat®)
**Date:** August 7, 2025

---

## \Summary

This report documents a covert promotional network—referred to as **"The Promo Cartel"**—involving **Daniel "A1" Hayes** and UMG-aligned intermediaries, who operate as gatekeepers to playlist access, algorithm visibility, and metadata ingestion.

In a January 16, 2025 email, Hayes confessed to:

- Accepting payments under false promotional pretenses

- Engaging in racial gatekeeping and selective suppression

- Participating in royalty redirection and metadata mislabeling

- Operating inside a closed loop of DSP manipulation disguised as "consultation"

Receipts and correspondence confirm Petitioner's direct losses and substantiate broader allegations of:

- **Constructive trust violations**

- **Metadata laundering via ingestion overrides**

- **Civil RICO predicate conduct (wire fraud, payola, misrepresentation)**

- **Discriminatory contracting in violation of 42 U.S.C. § 1981**

Petitioner requests preservation of ingestion logs, override histories, and internal UMG communications involving Hayes, third-party vendors, and Discovery Mode mechanisms.

---

**Prepared By:**
Joseph Anthony Reyna (JoeCat®) | Pro Se Petitioner
Founder, *Dreams Over Dollars*™
Registered Trademark Holder: JOECAT® (USPTO Reg. No. 6,057,783)

92

# Abstract: The Promo Cartel

This case centers on a documented pay-for-play scheme in the U.S. music promotions industry, substantiated by both a legal study and a whistleblower's own confession.

First, a 2020–2021 legal investigation revealed that Daniel "A1" Hayes routinely charged **$500 consultation fees** to independent artists, only to inform them that **$80,000 to $250,000** was required to "go to radio." These consultations funneled artists into off-the-books pay-for-spin deals, including a $12,000 offer for programmed rotation across named stations—without any on-air sponsorship disclosure—constituting classic **FCC payola violations** (47 U.S.C. §§ 317, 508).

Second, on January 16, 2025, Hayes sent a mass email to over 130 industry insiders admitting to **budget skimming, tax evasion via shell companies**, and the exploitation of Black-owned promo firms. He detailed how inflated radio budgets were laundered through entities like Adept Sales Consulting and LBP Marketing, while unpaid debts to vendors were justified with racial animus ("F*** them, they can wait"). The email implicates key figures—including Lester Pace and Lionel Ridenour—in an enterprise that Hayes himself describes as a **Ponzi scheme**, and offers to testify to the IRS with supporting financial records.

Together, the consultation invoices, email, and rate cards reveal a **criminally coordinated pay-for-access structure**, violating RICO, FTC, FCC, and civil rights laws while reinforcing a racialized economic hierarchy in music promotion.

113 raw emails – 12 duplicates ≈ 101 unique individuals

# Confessions from the Playlist:
# Inside the Promotional Ponzi Scheme Silencing Independent Artists

## I. Introduction

### Context and Purpose
Pay-to-play or "payola" is the practice of **paying** (or otherwise compensating) radio stations or their personnel for airplay without disclosing the arrangement to the public. Historically, high-profile scandals involving undisclosed payments led to **federal regulations** via the Federal Communications Commission (FCC) and involvement by the Federal Trade Commission (FTC) in consumer deception cases. Today, with digital streaming platforms and third-party "promoters," the landscape has evolved—but the legal risks (and ethical concerns) remain similar.

93

**Key Actors**

- **Daniel "A1" Hayes**: A self-described radio promotions executive whose communications reference steep fees for radio rotation, e.g., $12,000 for a single track's airplay.
- **Independent Artist (JoeCat)**: Paid Hayes multiple consultation fees and received quotes suggesting tens of thousands of dollars were necessary for sustained radio spins.

---

## II. Payola Definition and Legal Framework

1. **FCC Statutory Obligations**
   - **47 U.S.C. §§ 317 & 508**: Stations must disclose sponsored or paid-for airplay. Undisclosed financial arrangements that result in playlist inclusion can be **illegal** if they deceive audiences about the source or nature of content.
   - **Penalties**: Noncompliance can lead to fines or criminal charges. Even indirect payments (via an "independent promoter") can trigger liability if no on-air disclosure occurs.
2. **FTC Act (15 U.S.C. §§ 41–58)**
   - **Unfair or Deceptive Practices**: The FTC oversees consumer protection. Paying for radio or streaming boosts without disclosing the "sponsorship" may constitute misrepresentation if consumers are led to believe success is purely merit-based.
3. **State Consumer Protection Laws**
   - Some states have additional "commercial bribery" or "unfair trade" statutes that can apply if pay-for-play tactics artificially inflate one's exposure at the expense of fair competition.
4. **Modern Extensions (Streaming Services)**
   - **Playlist Manipulation**: Emails offering set numbers of Spotify "streams" (e.g., $1,000 for 50k+ plays) parallel the older radio payola model—potentially misrepresenting genuine listener demand.

---

## III. Factual Scenario

**Documents & Observations**

1. **Consultation Payments**

94

- o **Two $500 transactions** to Daniel Hayes (August & September 2020) labeled "Artist Consultation," with an invoice disclaiming "nothing of value exchanged for airplay."
- o Context indicates these consultations were steps toward purchasing radio rotation.

2. **$12,000 Radio Offer**
   - o An email dated September 16, 2020, titled "JOE CAT 'STRIPPER' $12,000," lists multiple stations (e.g., KQBT/Houston, WRBJ/Jackson) with **10–14 weekly spins**. No mention of any station disclaimers or on-air "sponsored content" identification.

3. **Spotify Stream Pricing**
   - o An email from "Gabrielle Ware" quotes **$1,000 for 50,000+ streams** up to **$6,000 for 500,000+ streams**, again suggesting pay-to-play in a digital environment.

4. **Invoice & Emails Contradiction**
   - o The invoice claims "no value exchanged for airplay," yet concurrent communications reference large sums (tens of thousands of dollars) for radio rotation.
   - o This discrepancy may imply an attempt to circumvent payola restrictions while effectively arranging paid exposure.

---

## IV. Analysis of Potential Claims

1. **Payola Violations (FCC)**
   - o If Hayes (or affiliated entities) are funneling money to stations for spins, stations are required to disclose such sponsorship on air. Failure to do so could be **prima facie** payola.
   - o The invoice's disclaimer does not necessarily protect parties if evidence shows undisclosed payments ultimately secured broadcast spins.

2. **Deceptive or Unfair Trade Practices (FTC)**
   - o **False Impression of Organic Success**: Listeners might wrongly assume the music is selected by DJs based on quality or popularity, not hidden payments.
   - o The FTC could act if this is deemed a deceptive marketing scheme harming consumer trust.

3. **Antitrust and Competition Issues**
   - o Large sums required for radio (e.g., $80k–$150k or more) may **bar independent artists** from entry, reinforcing a **monopolistic** dynamic dominated by well-funded labels.
   - o If the practice is widespread, it risks stifling innovation and limiting consumer choice.

95

4. **State-Level Actions**
   - Fraud, misrepresentation, or breach of contract claims might arise if "consultation services" are represented as something other than a means to circumvent payola laws.
   - Certain state attorneys general have historically pursued payola enforcement or allied with the FCC in relevant probes.

---

## V. Evidence and Contradictions

1. **Email Chains and Invoices**
   - The email quoting $12,000 for a "Stripper" single rotation, plus the invoice disclaiming "no exchange for airplay," underscores potential **deception**—one set of documents says "nothing for airplay," while another references specific stations, spin counts, and prices.
2. **Spotify Rate Cards**
   - Purchasing bulk plays (50k, 100k, 500k streams) also raises **consumer deception** concerns: fans, advertisers, or sponsors might believe the streams reflect genuine popularity.
3. **Normalization of High Fees**
   - The repeated mention of **$80k to $150k** as standard sums for radio campaigns is indicative of an industry pattern that effectively **locks out** independent artists, compounding the risk of **competitive harm**.

---

## VI. Brief Sworn Statement

*(Focused on Legal Context of Daniel "A1" Hayes' Role)*

**I, Joseph Reyna,** state under penalty of perjury:

1. **Professional Context**: I am an independent recording artist who consulted with Daniel "A1" Hayes regarding radio promotion in August/September 2020.
2. **Payment and Offers**:
   - I paid Hayes $500 twice for "artist consultation."
   - He referenced large sums (up to $12,000 for a single track push, and tens of thousands more for broader rotation) purportedly needed to secure multiple spins per week on selected radio stations.

96

3. **Lack of Disclosure**: Hayes never indicated that radio stations would disclose these payments on air, nor did he mention compliance with FCC "sponsored airtime" rules.
4. **Conflict with Invoice**: Although the invoice states "nothing of value exchanged for airplay," contemporaneous emails from Hayes proposed specific station lists, spin counts, and fees, implying pay-for-play.
5. **Legal Concern**: Based on this evidence and my understanding of federal regulations, these practices could constitute undisclosed sponsorship (payola), potentially deceiving consumers, distorting competition, and undermining independent artists' ability to succeed organically.

I affirm the above statements are true to the best of my knowledge and belief.

**Joseph A. Reyna / 01/03/25**

---

## Conclusion

The documents and communications tied to **Daniel "A1" Hayes** illustrate a **likely payola-like scheme** wherein large sums are solicited for radio exposure and streaming boosts without explicit on-air or public disclosure. Under **FCC, FTC**, and possibly state laws, such arrangements, if proven, risk violating **payola** provisions and **consumer protection** statutes. Moreover, the **monopolistic** environment created by demanding exorbitant sums for airplay and streams undermines market fairness—particularly harming independent artists who lack major-label resources.

## Key Takeaways

1. **Potential FCC Violations**: Undisclosed payments for broadcast spins typically violate payola rules.
2. **Consumer Deception**: FTC oversight could apply if these deals mislead the public into believing airplay or streaming success is organic.
3. **Monopolistic Barriers**: Requiring upwards of $80k–$250k for meaningful exposure cements a system that favors major industry players while marginalizing newcomers.
4. **Affidavit Use**: Short sworn statements focusing on objective facts, documentary evidence, and any lack of disclosure are critical for regulatory complaints or legal proceedings.

**2:08**

✕


**Joined
Aug 2017**

Not paid
by people
you know

Contacts
not synced

## Your history

2 Total Transactions

$0.00 　　　　　　　　　　**$1,000.00**

Total Received　　　　　　　**Total Sent**

 **2nd consultation - $...**　　**$500**
Sep 15, 2020

 **Consultation for Joe...**　　**$500**
Aug 20, 2020

Block

Report

2:09

✕

# Daniel Hayes

Sep 15, 2020 at 5:14 PM
For 2nd consultation - $500 toward $4,500
balance

# $500.00

## Transaction details

✓ **Complete**
Payment sent successfully

**Payment between**
To: Daniel Hayes
From: JoeCat

**Payment source**
Cash balance

**Fees** ⓘ
None applied

**Transaction number** ⧉
AJ54D7P

99

2:09

✕

# Daniel Hayes

Aug 20, 2020 at 2:51 PM

For Consultation for JoeCat / iDream Music Label

# $500.00

## Transaction details

✓ **Complete**
Payment sent successfully

**Payment between**
To: Daniel Hayes
From: JoeCat

**Payment source**
Wells Fargo

**Fees** ⓘ
None applied

**Transaction number**
NQSH04G

*100*



2:09

# Daniel Hayes
## $daniela1hayes

Request    Pay

☆ Favorite

Joined          Not paid          Contacts
Aug 2017        by people         not synced
                you know

### Your history

2 Total Transactions

$0.00                    $1,000.00

Total Received           Total Sent

2nd consultation - $...    $500
Sep 15, 2020

Consultation for Joe...    $500

101



JOE CAT "STRIPPER" $12,000   Inbox ×

**Daniel "A1" Hayes** <iamonaskbusiness1@gmail.com>
to me ▾           Wed, Sep 16, 2020, 10:51AM

KQBT/HOUSTON
KBLZ/TYLER TEXAS
WJMI/JACKSON, MS
KBTT/SHREVEPORT
SHADY 45
MCUR/MUSIC CHOICE*
WRBJ/JACKSON, MS
KMJJ/SHREVEPORT
WQUE/NEW ORLEANS
KRRQ/LAFAYETTE
KNDA/CORPUS CHRISTI*
KOOC/KILLEEN*

*Rotation 10-14 spins a week
mixshow 4-6 spins a week

[ Got it, thanks! ]   [ Got it! ]   [ Thank you! ]

[ ↩ Reply ]   [ ↪ Forward ]

---

Spotify pricing for Joe Cat   Inbox ×

**Daniel "A1" Hayes**        Wed, Sep 16, 2020, 9:56PM
Hey Joe looping in Miss Keep It G who can give you the Spotify playlisting prices -- Sent from Gmail Mobile

**Gabrielle Ware** <gabrielle@keepitg.co>        Thu, Sep 17, 2020, 5:29PM
to Daniel, me ▾

Good afternoon Joe,

For Spotify my prices are as follows:
$1,000 50,000+Streams
$1,500 100,000+ Streams
$3,000 250,000+ Streams
$4,000 350,000+ Streams
$8,000 500,000+ Streams

Please let me know if you have any questions or concerns. I am available for a call tomorrow morning until 11am

...

**Gabrielle H. Ware**
*Keep It G Marketing LLC*
**Founder & Chief Marketing Officer**
(E) Gabrielle@keepitg.co
(W) www.KEEPITG.co

102



# INVOICE
# 4589

**A1 Promotions LLC**
4227 Pleasant Hill Rd Bldg 13 Ste 200
Duluth, GA 30096

| | |
|---|---|
| Date: | Aug 20, 2020 |
| Due Date: | Aug 20, 2020 |
| **Balance Due:** | **$500.00** |

Bill To:
**Joseph Reyna C/O I Dream Music Label**

| Item | Quantity | Rate | Amount |
|---|---|---|---|
| **Artist Consultation for Joe Cat** | 1 | $500.00 | $500.00 |
| | | Total: | $500.00 |

Notes:
Nothing of value exchanged for airplay

Terms:
Bank of America
State of Ga
Checking Account #3340 3528 1490
Routing #061000052
Tax ID 47-5039229

or ZELLE hayesdaniela1@gmail.com or CASH APP $daniela1hayes

/03

12

**iDream Music Label**
At one word, no space lol sorry it's important, I'm ready to pay this now. Thanks!
Aug 20, 2020, 2:42PM ☆

**iDream Music Label**
just need it to match my business name and trademark
Aug 20, 2020, 2:43PM ☆

**Daniel "A1" Hayes**
No problem see attached
Aug 20, 2020, 2:46PM ☆

**Joseph Reyna**
Done. Sent. Talk soon. @JoeCatlt JoeCatlt.com On Aug 20, 2020, at 2:46 PM, Daniel A1 Hayes <iammusicbusiness1@gmail.com> wrote: <invoice # 4599.pdf>
Aug 20, 2020, 2:51PM ☆

**Daniel "A1" Hayes** <iammusicbusiness1@gmail.com>
to me ▾
Aug 20, 2020, 2:52PM ☆ 😊 ↩ ⋮

Got it, thanks bro, will talk to you tomorrow at noon EASTERN

• • •

**iDream Music Label**
https://join.skype.com/abdGqopmeROT I have the meeting open, camera and mic is muted. Talk soon.
Aug 21, 2020, 10:27AM ☆

**Daniel "A1" Hayes** <iammusicbusiness1@gmail.com>
to me ▾
Aug 21, 2020, 10:34AM ☆ 😊 ↩ ⋮

ok cool

• • •

104

**Promotional Fraud, Wire Conspiracy, and Economic Suppression in the Music Industry**

## I. Introduction

This case law study examines a leaked email communication dated **January 16, 2025**, authored by Daniel "A1" Hayes, which presents credible allegations of systemic payola, wire fraud, tax evasion, racketeering, and racial discrimination within the U.S. radio promotions sector. The email—sent to over 90 high-profile industry professionals—amounts to a **written confession and whistleblower disclosure** that implicates multiple actors in a criminal enterprise operating in violation of federal and state laws.

The communication is significant not only as an evidentiary admission but also as a roadmap detailing how industry insiders engage in coordinated deception through shell entities, budget fraud, non-disclosure of sponsored airplay, and discriminatory financial practices targeting Black promotion companies. This memo places these disclosures within a case law and statutory context, showing how they satisfy the evidentiary thresholds for violations of:

- The **Racketeer Influenced and Corrupt Organizations Act** (RICO),

- The **Federal Communications Act (Payola Statutes)**,

- **Wire Fraud under 18 U.S.C. § 1343**,

- **Tax Evasion under 26 U.S.C. § 7201**,

- **Deceptive Trade Practices under the FTC Act**, and

- **Section 1981 discrimination** based on racial bias in economic contract enforcement.

---

## II. Evidence Overview: The "Smoking Gun" Email

## A. Document Facts

- **Author**: Daniel "A1" Hayes, independent radio promoter

- **Recipients**: ~90 industry stakeholders (radio programmers, promoters, label representatives)

- **Date**: January 16, 2025

- **Subject**: Exposé of internal corruption, fraud, and financial coercion in radio promo schemes

## B. Key Confessions & Allegations

- Admission of **budget padding** and **fraudulent skimming** ("Don't tell me the budget is $50k when it's $65k. Where did the $15k go?")

- Direct implication in **undisclosed payments to radio programmers** ("You owe Manny $20k for adds")

- Allegations of **racial bias in payment prioritization** ("F*** them, they can wait" — referencing Black-owned promo firms)

- Confirmation of **tax evasion structures** ("You told my company to pay yours through Adept Sales Consulting to avoid the IRS.")

- Use of **shell corporations** and invoice manipulation

- References to retaliatory actions against whistleblowers ("Y'all didn't expect me to lawyer up. I did. And I won.")

---

## III. Legal Analysis

## A. RICO Violation – 18 U.S.C. § 1962

**Pattern of Racketeering Activity:**

- **Predicate acts**: wire fraud, commercial bribery (payola), tax evasion

- **Enterprise**: A coordinated network of independent and major-label-aligned radio promoters acting in furtherance of financial deception and coercion

- **Continuity**: Described as ongoing across multiple projects, spanning years

106

- **Relatedness**: Each act furthers the revenue skimming and manipulation of artist budgets

*See: H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)*

---

## B. Wire Fraud – 18 U.S.C. § 1343

**Elements Met:**

1. **Scheme to defraud**: Concealed agreements, budget inflations, and falsified invoices

2. **Use of wire communications**: Documented via mass email

3. **Material misrepresentations**: Deceiving clients and stakeholders about payment allocations

---

## C. Payola – 47 U.S.C. §§ 317 & 508

**Violation:**

- The email reveals **direct payments to programmers and stations for adds**

- No mention of these payments being **publicly disclosed on-air,** violating FCC disclosure laws

    *"JOE CAT 'STRIPPER' $12,000" email matches playlist slotting with payment—absent any disclosure*

---

## D. Tax Evasion – 26 U.S.C. § 7201

**Key Evidence:**

- Admission of **structuring payments to avoid IRS scrutiny**

107

- Named use of corporate fronts (Adept Sales Consulting, LBP Marketing)

- Threat of "singing" to the IRS further supports the actor's knowledge and intent

*Any voluntary disclosure following this email would be legally void under willfulness standard in Cheek v. U.S., 498 U.S. 192 (1991)*

---

## E. Consumer Deception – FTC Act, 15 U.S.C. § 45

**Unfair Trade Practices**:

- Music consumers are led to believe spins are organic when they're bought

- This email proves deception, as playlists and spins are **covertly monetized**

- FTC standards treat hidden sponsorships as consumer harm

---

## F. Racially Discriminatory Conduct – 42 U.S.C. § 1981

**Economic Suppression**:

- Quote: "F*** them, they can wait" in context of payment to Black promo firms

- **Section 1981** protects the right of all persons to make and enforce contracts without discrimination

- The prioritization of white-owned vendors violates this statute

*See: Patterson v. McLean Credit Union, 491 U.S. 164 (1989)*

---

## IV. Implications for Civil and Criminal Liability

This document alone warrants:

108

- **DOJ Criminal Division referral** under RICO, Wire Fraud, and Tax Evasion

- **FCC Enforcement Bureau complaint** under Payola statutes

- **FTC Consumer Protection referral** for deceptive marketing

- **Class action risk** from artists defrauded by budget skimming

- **IRS Whistleblower claim** under 26 U.S.C. § 7623(b)

-----------------------------------------------------------------------------------------------------

## V. Conclusion

This email is not merely a grievance; it is **prima facie legal evidence** of a criminal promotional cartel that weaponizes insider relationships to defraud artists, mislead consumers, and avoid lawful taxation. The sender (Daniel "A1" Hayes) simultaneously confesses and implicates others, establishing a documented conspiracy to defraud.

109

# EMAIL from Daniel 'A1' Hayes on JANUARY 16TH, 2025

**From:** "Daniel \"A1\" Hayes" <iammusicbusiness1@gmail.com>
**Date:** January 16, 2025 at 4:01:06 PM CST
**To:** Lester Pace <lesterpace@gmail.com>, Lester Pace <lesterpace64@gmail.com>
**Cc:** Just Me <allforyourpromotions@gmail.com>, Drew Harley <andrewharley87@gmail.com>, Reza Sarrafieh <reza@parspromotions.com>, Reza Sarrafieh <REZA411@gmail.com>, WU muss <wumusicinc@gmail.com>, Dolewite Wallstreet <dolewite@gmail.com>, Carlos <los.so3@gmail.com>, Lionel Ridenour <anchorpromollc@gmail.com>, Shadow Stokes <Casinoshadow@gmail.com>, Richard Nash <richard8nash@aol.com>, "Mike Street (WBTJ PD)" <mike.street@audacy.com>, Jackson Brown <realjacksonbrown@gmail.com>, Hiphopreneurs <hiphopreneurs@gmail.com>, Sidnee Land <SIDLAND10@gmail.com>, Kadife Sylvester <guerilla.promotions@gmail.com>, Magic Crutcher <msmagic94@gmail.com>, The Dean <travisthedean@aol.com>, Devin Butler <devinsteel@gmail.com>, 360 Radio <360radiopriorities@gmail.com>, djq@alphamediausa.com, "Bruce Foxx (DJ Fresh)" <djfreshinc@aol.com>, Stan Branson <BRANSTAN@aol.com>, Brown <louisville.brown@alphamediausa.com>, ALLAMERICANPROMOTIONS09@gmail.com, Ricardo Hunter <ricardohunter1@gmail.com>, Antonio Tubbs <antonio@715management.com>, Anthony Simmons <bigant27@aol.com>, Colby Colb <clyner@radio-one.com>, Troy Marshall <tamarshall1906@gmail.com>, Dee Sonaram <deepiiboss@gmail.com>, Kerry Carter <kerry.axa@gmail.com>, Kerry <kerrydouglas65@gmail.com>, Donielle Pace <doniellepace@gmail.com>, doneason1@aol.com, bennypough@gmail.com, doclovecc@gmail.com, Steve Chavez <chachizel@gmail.com>, Gentleman George <gentlemangeorge70@yahoo.com>, "KKDA - George (Geo) Cook - PD" <geocook.strategist@gmail.com>, Sandra from Triple 8 Media Group <sandrasmith@triple8mediagroup.com>, Sandra Smith <sandrasmith798@gmail.com>, Leroy McGlathery <ourturnlm@aol.com>, Dorian Washington <ballball812@gmail.com>, Terrence Bibb <terrencebibb@gmail.com>, "Sean Rock (Srmpromoinc)" <srmpromoinc@gmail.com>, qeradio@aol.com, Illie III <djillieiii@gmail.com>, Greg <greg@lawmanpromotions.com>, "Promo Team Inc." <promoteaminc@aol.com>, WPEG-FM Incognito <incognito@power98fm.com>, Dj Geronimo <Mydjsgeronimo@gmail.com>, Yahoo <bjoe923@yahoo.com>, Manny Bella <manny@cityboyent.com>, Tani Robbin-Coker <TALUS@wordofclout.com>, Arnold Taylor <ATAYLORTRP@aol.com>, Arnold Taylor <southcoastmarketing@gmail.com>, Angela Watson <radiodiva504@gmail.com>, Rob Neal <robnealn@aol.com>, Kwasi Kwa <kwasi.upscalemusic@gmail.com>, Kwasi Kwa <radiogeeek@gmail.com>, Rob Neal <robnealwqld@gmail.com>, A-Plus <awillis@radio-one.com>, WVEE - DJ P Nut -Mixer <Djpnutmusic@gmail.com>, Robert Ewing <thedjreadyrob@gmail.com>, Jim Elliott <thespindoctorinc@aol.com>, Malcolm Miles <dclmalcolm@gmail.com>, "Steve Hegwood (WSTR)" <ontopcom@aol.com>, Lisa Bledsoe <Lbpmarketingandpromotions@gmail.com>, Jodi Williams <jodi@blitzmediaevents.com>, Azim Rashid <azimrashidnyc@gmail.com>, Azimrashidwork@gmail.com, geobivins@gmail.com, juliette.jones@alamo-records.com, wilson.ken@mac.com, rmk247@aol.com, CHARITA BRITTENUM-CARTER <cdbritt04@comcast.net>, Cory Sparks <Corysparks@gmail.com>, Alexis White <alexisjwhite85@gmail.com>, maurice harley <mauriceharley@gmail.com>, Maurice White <MREESEWHITE@aol.com>, Maurice Moetown Lee <Moetownlee@gmail.com>, Maurice Harley <mauriceharley@aol.com>, Maurice Moetown Lee <mtown333@aol.com>, "Neil H." <NeilH@maddluvpromo.com>, Erwin Hill <ehill@radio-one.com>, RONSTEW@me.com
**Subject:** THE STORY OF HOW LESTER PACE, THE COKE HEAD & JW TURNED BLACK PROMOTION COMPANIES

110

Judas aka Lester Pace

You have falsely and viciously slandered my name so much to so many people it would take me all month just to call everyone so let's pick up the pace here. Since you can't help but continue to lie and talk shit behind my back, let's put it all out there in the open in front of my face for everyone you've tried to defame me to. And by the way, you're too old for this shit.

It's simple. We all know you're the former or present coke heads errand boy. Then we all know JW, the self-proclaimed tax professional, is your do-boy. ( I'm sure he owes people on this thread money as I type ) So let's just call you guys the bald-headed three amigos shall we. Very suiting name if you ask me.

The coke head who shall remain nameless was doing fuck shit with the budgets, padding them and skimming off the top, middle, and bottom. He brought those old Arista Records and Virgin Records habits with him into my business, turning it into a Ponzi scheme. I called him out on it and I told you about it because you were supposed to be the OG. What I didn't know was that you've been a silent partner in his promotions company this whole time with the coke head , letting him use me and take advantage of me, even though you knew it was foul, fucked up and dead ass wrong.

I got fed up. I told the coke head that it wasn't right to be owing all these black promotion companies money (not discriminating against Manny and Reza but you get the context). The coke heads response was, "Fuck them, they can wait." His greed made it impossible for me to run a real business with all his kickbacks and bad habits. I'm not saying he's back playing with his nose, but don't tell me a budget is 50k when it's really 65k. Where did the other 15k go ? and then be confused about why invoices can't get paid on tome when we have 55 + adds the first week.

Clearly, we know the coke head is a liar. No defamation here because unlike you, I got proof . But see Lester, the coke head has you by the balls, so you couldn't do the right thing. I hope you are not on that shit too. You're loyal to money first and people second. When I stood up for myself and had no choice but to lawyer up, I shocked you 🧟 it became a problem. You, Lester, are going around telling people that I misappropriated funds and stole the money from promotion budgets and that's why people can't get paid. Telling people I spent the money on my wife's birthday party and on trips.

Now I know it's hard for you to fathom that men actually love and adore their wives and do nice things for them. You cheat on every woman you're with and only care about yourself, so you think it's some big conspiracy that a man can actually be faithful and into his wife. The only problem with your story is, there's this little thing called discovery. That's when two attorneys turn over documents to see the burden of proof. I have bank statements that show where all the money went. Funny how the coke head's attorney didn't want to see them. Nor did you guys want to bring in a forensic accountant that I voluntarily said I would pay for? Why not? 🤷🤷 if I'm a theif and I stole the budget and fucked it off ,Why on earth settle with me (Allegedly) and give me more money (Allegedly) if I'm a thief??? Oh, because that means the coke head would have to turn in his bank statements too, and everyone would see the money trail leading back to him. That's called fraud and embezzlement (Allegedly), oh and y'all didn't want to be dragged into the trades in Billboard and Variety with xyz employee defrauds investors with old radio kickback schemes would of made a hell of a great headline, ohhh I see, Well we all have choices right ? but whatever you say, Judas.

The REAL ISSUE is that you, the coke head, and JW have your egos wounded and didn't expect me to lawyer up and take a stance against all this fuckery. I won. Y'all lost. Fucking get over it.

112

Lester, you told me to suck it up and charge it to the game when you knew the coke head owed me all this money. You thought I was trying to count his pockets but I was counting all the overdue and past due invoices that my company name was on that owed money on behalf of your silent business partner . Makes sense now that we know you're a silent partner in his company. But let's Anchor this right here. Since you don't know how to be silent and you like to be loud, then let's be loud. As far as me and my legal team are concerned , the coke head turned my company into a Ponzi scheme, running through budgets, and you used my company to pay you at LBP Marketing, which, let's be clear, is not Lisa Bledsoe Pace. You'd actually have to do right by her, stop being a hoe, and marry her for her to get that last name, but whatever you say. I know you thought women and children were off limits until you said something about my wife so respectfully and disrespectfully FUCK YOU. And you instructed my company to pay your company Adept Sales Consulting to keep avoiding the IRS. I believe that's TAX EVASION (allegedly) I'm not sure if you still owe them four million dollars (allegedly) but the Criminal Division of the IRS would know. Because if they call me ,and come see me in person like they did several others on this thread, OH I'm going to sing. I'm going to sang in fact . I'm going to sang so damn good, hit one of them j Howell falsetto notes that somebody on this thread might offer me a record deal. Again no slander here because it's this little thing called discovery just like if the alphabet boys ever ask me, I have proof. So class, are we discovering something new today ? I believe so. Unfortunately we are all discovering the real coward in you Dr. Pace . And remember I kept my mouth shut 🤐 but you brought this on yourself.

113

I remember Maurice Harley asked me, "Daniel, do you think the coke head actually lives in the Virgin Islands and got to where he is by being an honest business man"? Makes sense now. Shadow once told me this business is like the mob, but that's not true. The mob had rules. The mob had a code of silence but yall started running yall mouth.The mob killed people (Allegedly) but I tell you what's not alleged, You ☠are just bitches. You talk all that shit, but in real life, none of you ☠ would slap a baby picture of me.

I don't ever recall you Lester or the coke head or JW playing with G like that because y'all scared of him. I get it. So you thought y'all could play with me like that. Welp, just you ☠ even thinking that was even an option was your first mistake.

Lester, you are always in the gym lifting weights, doing all them push ups to pump up your chest, you're six-foot-tall, 200-odd something pounds and even with all that you're still full of pure bitch. You take all them damn vitamins but I guess they don't have one for loyalty, which is what I was to you for 15 years and didn't steal a penny from you. We never had any problem until you made a deal with that devil. And ironically that devil was in bed with that white girl. Would have followed you into hell if that's where you wanted to go, but the problem is I can think for myself, you can't just tell me anything, and I got heart and I got balls and no mf they don't sell that. So you can be pissed all you want, better than being pissed on if you ask me, but You're not going to do shit, so stop talking to people like you are. That's like you saying you're going to stop fucking with Steve Hegwood because he won't play your J Howell record, just to turn around and beg for adds on something else the next week. You're not going to do shit. You pick on programmers like little ol Rob Neal but don't do shit about Hegwood. Always thinking you can shut somebody down or shut some station down maybe you should shut your damn mouth and we wouldn't be here, because as yall recently found out I don't start shit but i definitely end shit.

So stop telling people and saying what you gonna do if you ever run into me, everybody knows I live in Houston and I'm not hard to find. I frequent the same spots you be at and you know if I see any sudden movement of hostile aggression in my direction at any point from you, it's self-defense. And no, this is not a threat. Everybody knows I'm from Detroit, and bitch we don't do threats. I live at the intersection of fuck around and find out. So just take your L and move the fuck on with your life whatever is left of it. You, and your lap dog JW, and the coke head can't hold yourselves accountable. Say it with me Lester ACCOUNTABLE the coke head is a bully and has been bullying people in this business for a long time. The difference is you can't bully me. You should pay Manny his fucken money yall owe him 20k THIS IS NOT ALLEGED IT'S ALL FACTS. and stop the fuckery. and to The coke head stop telling Manny not to talk to me. What is this, middle school? He's a grown ass man and he can talk to whomever he wants to talk too smh. Pay Tommy Marshall his 7k that's left and pay Travis Knuckles his 5 or 6k too, and stop with the bullshit. Y'all are lying, telling people you're going to get it from the next project. So you're going to take from Artist A and B's budgets to pay for other projects? You do realize that's a Ponzi scheme, right? Say it with me Lester, PONZI SCHEME.

I can talk like this because I have receipts and I can back it all up. This is not the Steph Johnson days, where y'all can just curse out people on conference calls and belittle them (allegedly) and tell them to STFU MF YOU WORK FOR ME as the coke head so nicely put it to me with you on the phone and not once did you say hey coke head, you gotta chill or hey that's not cool why are you talking to Daniel like that all because I missed an add???. And your explanation is well back in that day that tone was acceptable, and they were also drugging women back in the day too but that didn't make it right. Then again you JW and the coke head did come from that era of Clive Davis/Diddy Arista/bad boy where that despicable shit was acceptable, so I can't speak on that it's before my time!! But what I can speak on is this false notion of you saying you blackballed me. lol 😂 You're not God. We all know you think you are, but YOU don't have that kind of power.

Lester, you've fallen out with the whole gang , Fatema, Ricardo, Antonio, and now me. But we're all the problem, right? Never you. We were supposed to SET THE PACE then you get with buddy who keeps playing with that nose candy and he SEPARATED THE PACE smh. This is how we all know you're a sore loser. Anybody on this thread that has been to one of your awesome Super Bowl parties knows you always have two jerseys that say bandwagon. If your team loses you'll put on the winning jersey of the other team because you can't stand to lose, isn't your saying you're not always right but you're never wrong ? That's classic narcissism jack ass.

When Shadow owed me 15k in invoices and I came to you because my mother was fighting breast cancer and I needed every dollar to help pay for her chemotherapy in 2019 what did you do? You told Shadow, "If Daniel is too difficult to work with, just use my niece," and replaced my mixshow account with Donielle. (Love you pace poetry 😭 no beef with you, your uncle just did some sucka shit per usual) Lester You didn't tell Shadow to pay me because you were too much of a pussy. You chose money over doing what was right, you were so scared you were going to lose the E1 and 300 indie account? . But you said we were family right ? By the way, Shadow your check is still in the mail kind of like how mine used to be so I know it's been about 12 weeks but keep looking out for it. It's coming like you used to tell me. 😭

But that's my TED Talk for today . Bottom line Lester i will keep exposing for the clown you are so please just Shut the fuck up, (respectfully) or we can subpoena everybody in court. When I say everybody I really do mean everybody when I say it's Detroit VS everybody we really mean that shit, I'm not scared of you. I'm not scared of JW. AND I'm especially not scared of the coke head who got choked out by G LOL. Y'all are ALL 60-plus years old. Yall should be taking naps and playing with your grandkids anything other than spreading lies about me, my advice: Find something safe to do because this ain't it. I already legally beat y'all ass once with my lawyer and I'll tap that ass again in court if I have to. NOW CALL ME DADDY.

116

And coke head, maybe you're back on that shit, maybe not, (Allegedly) but your attitude and how you talk to people make it hard to tell. Be careful. They're lacing shit with fentanyl these days, and we wouldn't want anything to happen to you. We as a promotion family love you. Well some of us 🐀. I don't think addiction is funny at all personally, but you seem too.

To everyone on this email thread, I'm sorry I had to group email everybody like it's Xmas time when everybody sends out those annoying family group texts. But since we all say we're family in promotion, it seemed appropriate. LESTER PACE I WAS MINDING MY BUSINESS WASN'T SAYING ANYTHING TO ANYONE IT'S BEEN 4 MONTHS OF YOU SLANDERING ME. I will not allow anybody to lie on my name or bully me IDGAF if you were my mentor at some point or not. And if you don't know my name is Daniel "A1" Hayes. So to the 3 bald headed amigos, Leave me alone or I'll see all you 👨‍⚖️ in court . We can leave it here and you 3 👨‍⚖️ can stop and leave that goofy shit in 2024 or when my attorney gets done filing and files a lawsuit against all tree of yall (in my birdman's voice) in federal court, we can all hit TMZ together, it doesn't matter to me and yall know i'm not playing the shit already drafted it up. Me allegedly settling with y'all In mediation in November for the fuck shit yall did was more of a courtesy never forget like 9/11. Lester, you know the story of David and Goliath who you think is Goliath and who you think is David? To everyone else sorry for the long email and foul language but somebody had to say it ! Moral of the story Lester please stop telling promoters and programmers lies about me and I won't tell the IRS criminal investigation department truths about you.

And to the coke head here you are https://westcare.com/services/treatment-rehab/ or call the drug abuse number if needed (340) 719-9900

And To The All American Failure JW if you just keep being Lesters lap dog and do what masta says YOU TOO can.... NVM lol Happy 2025 Bitch


# And remember **P.**ostive **A.**ttiude **C.**hanges **E.**verything!

117

**THREAD ANALYSIS: "THE PONZI SCHEME EMAIL" – Jan 16, 2025 @ 4:00 PM**

**EMAIL COUNT**

- **Single Email Sent**

- No nested replies or earlier emails indicated

- This is **not a thread**, it's a **mass broadcast disclosure**

**Strategic Comment:**
This email was not meant to "start a conversation"—it was meant to **expose a criminal structure** in a single, public-facing blast to the industry. This makes it legally closer to a *whistleblower memorandum* or *industry-wide affidavit* than a personal or informal email. It is evidence, not just communication.

---

**TOTAL EMAILS / RECIPIENTS ANALYZED**

- **Unique addresses extracted:**
  **137 total email addresses** appear in the To: and Cc: fields combined.

- **After removing clear duplicates (same person, multiple addresses):**
  ≈ **126–128 unique individuals**

- **Types of people on this email:**

    o **Radio programmers (PDs, DJs)** from major stations (e.g. Audacy, Alpha, WPEG-FM, Radio One)

    o **Independent promotion companies**

    o **Label execs / A&Rs** (e.g., Alamo, Triple 8 Media)

    o **Marketing firms**

    o **Veteran radio figures** (e.g., Geo Cook, Mike Street)

118

○ **Finance- or tax-flagged recipients** (e.g., firms like Adept Sales Consulting)

---

## COMMENTARY ON THE EMAIL ITSELF

This is one of the **most high-stakes disclosures in the modern music business**.

- It **names names**.

- It includes **direct accusations of fraud**, **wire crimes**, **tax evasion**, and **payola**.

- It implicates not just individuals but **structural abuse across the radio + promo economy**.

- The mass cc'ing was intentional—it **forced a quorum of knowledge**, removing plausible deniability.

- The language is raw, emotional, but grounded in **firsthand financial knowledge** and contract history.

This email **functions as a whistleblower affidavit**, legally *and* culturally. It's also arguably **a RICO predicate in plain text**.

119

**SWORN DECLARATION OF ONGOING HARM**

**In Support of Rule 27 Petition**

I, **Joseph Anthony Reyna**, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Petitioner in this matter. I submit this sworn declaration in support of my Rule 27(a)(1) petition seeking pre-suit discovery and preservation relief.

2. I am a federally documented whistleblower, nonprofit director (Dreams Over Dollars™, EIN: 88-2187078), and the registered trademark holder of **JOECAT®** (USPTO Reg. No. 6,057,783).

3. I am the original author of the track *"Where the Party At Pt. 2" (2012)*, which has been misattributed, redistributed, and remixed without consent or compensation since its original release.

4. My metadata has been disambiguated across platforms, including Spotify and YouTube, resulting in the misrouting of royalties and the suppression of search visibility for my verified alias "JoeCattt."

5. As a result of this suppression, I have incurred:

    ○ Over $55,700 in direct financial loss (royalties, bookings, cancellations);

    ○ Over $186,000 in extended harm (eviction, legal fees, and defamation-related impact).

6. I issued formal notice to UMG on June 16, 2025, outlining metadata fraud, AI-linked valuation concealment, and authorship erasure. UMG has not responded.

120

7. I have also filed over 35 FOIA requests, multiple amicus briefs, and whistleblower disclosures to agencies including the SEC, DOJ, IRS, and FinCEN—all of which have either ignored or failed to act on these claims.

8. Every day that this evidence is not preserved increases the likelihood that critical metadata, ingestion logs, and licensing records will be destroyed, altered, or rendered inaccessible through third-party integrations or deletion protocols.

9. I respectfully submit this declaration as evidence of irreparable harm, ongoing injury, and the need for immediate preservation relief.

Executed this 7th day of August, 2025, in Travis County, Texas.

Respectfully submitted,

/s/ Joseph Anthony Reyna

**Joseph Anthony Reyna (aka JoeCat®)**

Pro Se Petitioner

5900 Balcones Dr. #16077

Austin, TX 78731

Email: whitehat@joecattt.com

121

**EXHIBIT AE**

**Email to Sidley Austin LLP Requesting Pro Bono Representation While Counsel to Universal Music Group**

**Filed In Support Of:**

Rule 27 Petition for Pre-Suit Discovery

Joseph Anthony Reyna v. Universal Music Group N.V.

**Date of Email:** December 4, 2024

**Sender:** Joseph Reyna (whitehat@joecattt.com)

**Recipients:** Sidley Austin LLP attorneys

**Subject Line:** Request for Pro Bono Representation: Transforming the Music Industry Through Systemic Litigation

**Purpose:**

To demonstrate that Petitioner contacted Sidley Austin with detailed allegations and evidence against UMG and related parties—while Sidley was actively representing UMG—placing Respondent and its counsel on constructive notice and reinforcing the need for judicial preservation.

122

5270 1991 3157 12

R AT TOP OF ENVELOPE TO THE RIGHT
IN ADDRESS, FOLD AT DOTTED LINE

**IFIED MAIL**®

5270 1991 3157 12

*Retail*

U.S. POSTAGE PAID
PM
BUDA, TX 78610
AUG 08, 2025

10007

**$22.45**

S2324H500550-08

**RDC 03**

RECEIVED
AUG 12 2025
CLERK'S OFFICE
S.D.N.Y.

RECEIVED
AUG 14 2025
PRO SE OFFICE

ro se

SDNY

00 Pearl St.
ew York, NY 10007