**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

**Joseph Anthony Reyna (JOECAT®),**

Plaintiff,

v.

**Universal Music Group N.V.,**

Defendant.

Civil Action No. 1:25-cv-06779

---

**FINAL EMERGENCY SUPPLEMENTAL RULE 27 FILING**

**REGARDING SYNTHETIC ARTISTS, MARKET DISTORTION,**

**AND HEIGHTENED EVIDENTIARY INSTABILITY**

Petitioner **Joseph Anthony Reyna** respectfully submits this Final Emergency Supplemental
Filing in further support of his Petition under Federal Rule of Civil Procedure 27.

This filing integrates:

- newly documented industry developments,

- contemporaneous media analysis of metric distortion,

- international regulatory recognition of AI-driven evidentiary risk, and

- the structural consolidation of charts, data, and music media under common financial control,

all of which confirm that the digital systems at issue overwrite themselves automatically and that the evidentiary environment has materially changed since the initial petition.

**The purpose remains strictly procedural.** Petitioner incorporates by reference the Rule 27 Petition previously filed in this matter and reiterates that:

1. He expects to be a party to an action cognizable in this Court challenging the accuracy, integrity, and provenance of streaming-related metadata, chart-ranking inputs, and comparative performance datasets;

2. He cannot presently bring that action while the identification of necessary parties, data custodians, and regulatory interfaces remains incomplete; and

3. The electronic evidence described herein faces ongoing risk of loss, overwrite, migration, or alteration before that action can be filed and fully served.

Accordingly, this supplemental filing seeks only to:

• prevent the loss of electronic evidence essential to the anticipated action;

• document the material change caused by the emergence of synthetic (AI-generated) artists and synthetic traffic in national chart positions; and

• ensure that this Court preserves its future jurisdictional capacity to adjudicate the forthcoming case.

Petitioner does not seek merits adjudication, industry restructuring, or economic relief at this stage. The function of this filing is preservation and nothing more.

---

## I. THE TIME-SENSITIVITY OF DIGITAL OVERWRITE

Electronic evidence relevant to the anticipated action exists only within systems that:

- overwrite automatically,

- migrate without notice,

- recalculate continuously,

- compress and purge routinely, and

- retain only the most recent state of the dataset.

Delay does not preserve the status quo.

**Delay alters the evidence irreversibly.**

The evidentiary record at issue includes, among other things:

- historical metadata states;

- chart-weighting algorithms and change logs;

- audit-trail logs and ingestion timestamps;

- synthetic vs. human input flags;

- internal corrections and reprocessing events;

- platform-to-Luminate ingestion criteria; and

- prior ranking calculations and intermediate files.

Any day without a preservation order increases the probability that this Court's future jurisdiction over the anticipated action will be impaired because the factual record necessary to adjudicate that action will no longer exist.

Rule 27 was drafted for precisely this class of fragile digital evidence.

---

## II. CONTEMPORANEOUS INDUSTRY EVIDENCE: THE STEREOGUM ARTICLE

### A. Judicial Notice (Fed. R. Evid. 201)

Petitioner requests judicial notice of the existence and publication date of the following:

**Exhibit A –**

Michael Nelson, *"Skewed VIEWS: The Huge Truth About Drake's Record-Breaking Chart Run,"* Stereogum, Aug. 5, 2016.

The article is not offered for the truth of every statement or for any allegation of specific misconduct. It is offered to establish that, as early as 2016:

1. Industry observers already understood that **chart data was driven by self-reported, unaudited streaming numbers**;

2. Exclusive platform deals had the potential to distort national charts without reflecting population-wide demand; and

3. The reliability of the Billboard 200 and related metrics, as then constructed, was publicly questioned as "dubious" and structurally vulnerable.

Judicial notice is requested solely as to:

- the fact of publication;

- the date of publication; and

- the existence of a contemporaneous, widely circulated critique identifying **self-reported, unverifiable streaming data** as a systemic problem.

This goes to **context**, not liability.

**B. Relevance, Routine Practice, and Market Reports**

(FRE 401, 406, 803(17))

The Stereogum article functions as:

- **Relevant evidence (FRE 401)**: It makes more probable the proposition that chart metrics can be distorted by unaudited, platform-supplied streaming data and exclusivity arrangements.

- **Evidence of routine practice (FRE 406)**: It reflects what industry professionals understood to be the ordinary operation of charts in the streaming era: reliance on self-reported streams without independent audit.

- **A market report or commercial publication (FRE 803(17))**: It constitutes a commercial commentary and data-driven analysis of market behavior and chart methodology relied upon by persons in the occupation of music journalism, criticism, and industry analysis.

To be clear, Petitioner does not offer Exhibit A to prove that any one artist "cheated."

It is offered to prove that, as of 2016, the industry already recognized that:

- chart positions were structurally tied to unaudited, platform-reported numbers;

- those numbers could be skewed by exclusives and internal promotional arrangements; and

- the resulting charts could not be treated as neutral reflections of actual consumer demand.

**C. Structural Consolidation of Data, Charts, and Media**

Subsequent corporate developments placed:

- the chart brand (Billboard),

- the underlying data provider (Luminate, formerly Nielsen's music data business), and

- influential music media outlets (including Stereogum, Spin, Vibe)

under overlapping financial control within the Hollywood Reporter–Billboard Media Group and related entities backed by Eldridge-affiliated capital.

In practical terms, this means:

- the entity that **collects** streaming data,

- the entity that **translates** that data into charts, and

- the outlets that **narrate** those charts to the public

have, at various times, operated within the same consolidated corporate architecture.

Petitioner does not allege wrongdoing from this fact alone.

It is offered to show why independent, third-party **auditing and preservation** of the underlying datasets are essential:

the same ecosystem that benefits from the perception of chart objectivity has structural incentives to minimize scrutiny of the underlying data pipeline.

**D. Litigation Function of Exhibit A**

Within this Rule 27 context, Exhibit A:

1. Establishes **contemporaneous notice** that the streaming-to-chart pipeline was structurally vulnerable;

2. Supports targeted, narrowly tailored **discovery into chart methodology and streaming ingestion**;

3. Justifies **judicial notice** that these concerns predate the current dispute;

4. Provides a foundation for **Daubert challenges** to any expert who treats charts as inherently reliable; and

5. Supports **preservation orders** and **spoliation safeguards** for raw data and methodology.

The article is not "just a blog post."

It is **contemporaneous market evidence** that the underlying metrics were known to be unstable and unverifiable long before this Petition.

---

## III. LIMITED EARLY DISCOVERY UNDER RULE 26(d) AND RULE 27(a)(3)

Given the structural vulnerabilities documented in Exhibit A and the instability introduced by synthetic, machine-generated inputs, Petitioner requests a narrow modification of the Rule 26(d)(1) sequencing to permit limited discovery directed solely to identification and preservation of evidence. This request does not seek merits discovery.

Petitioner seeks leave to issue narrowly tailored requests or subpoenas to Luminate, Spotify, Apple, and other custodians of chart-relevant datasets for the limited purpose of identifying:

• custodians responsible for streaming, chart, and weighting datasets;

• the locations and technical formats of logs, ingestion files, and methodology documents;

• applicable retention schedules, overwrite functions, and migration policies; and

• any technical distinctions or flags used to differentiate synthetic inputs from human-origin activity.

Petitioner further seeks authority to obtain sworn declarations, or if necessary narrowly confined Rule 30(b)(6) testimony, limited to preservation logistics and the identification of systems required to safeguard the evidence.

The logic is straightforward: judicial notice of historical metric distortion establishes good cause to determine whether comparable vulnerabilities exist in the present data pipeline, and to ensure that underlying records are not destroyed or altered before the anticipated action can be filed. Courts in this District recognize that Rule 27(a)(3) permits discovery for the limited purpose of identifying and preserving evidence, and that Rule 26(d) may be modified where, as here, electronic records face imminent degradation.

Preservation in this context is not intrusive; it functions like stabilizing a structure before inspection. The goal is not to remodel the building, but to prevent its beams from collapsing before the Court can examine them.

---

## IV. SYNTHETIC ARTISTS, SYNTHETIC TRAFFIC, AND THE RULE 27 EMERGENCY

Since the initial Petition, multiple AI-generated artists have entered nationally recognized Billboard charts, including *Breaking Rust*, *Cain Walker*, and *Xania Monet*, as reported by mainstream publications and industry metadata sources. These entries matter not for who they are, but for what they represent: inputs into the chart system that leave no human-origin footprint. Human artists generate reconstructable records — contracts, touring histories, PRO logs, interviews, press, community documentation. Synthetic artists generate none of this. Their

"presence" consists solely of platform-generated metrics, algorithmic recommendations, and private chart-ingestion files.

Once overwritten or migrated, these synthetic-origin metrics cannot be reconstructed from independent evidence. They exist only inside systems that continuously rewrite themselves. Rule 27 was designed for exactly this category of fragile, non-reconstructable electronic evidence. Because synthetic inputs now intermix with human data inside the same ranking algorithms and weighting files, preservation of the full mixed dataset is necessary to protect the integrity of the anticipated action.

Streaming platforms have clear economic incentives to expand synthetic content: no advances, no labor costs, no royalty negotiations, no termination rights, and infinite production at near-zero marginal cost. As synthetic content proliferates, platforms rely even more heavily on opaque, continuously recalculated systems — increasing volatility, silent corrections, and the risk of irreversible loss before litigation can begin.

Federal prosecutions such as *United States v. Arrington* and *United States v. Michael Smith* demonstrate what happens when non-human inputs distort demand. Those cases involved synthetic traffic; the current ecosystem involves synthetic artists. Both categories feed directly into the same evidentiary pipeline. One has been prosecuted as fraud, the other marketed as innovation. Petitioner draws no personal comparison — only a structural one.

## V. CONTEMPORARY ANOMALIES DEMONSTRATE LIVE DATA INSTABILITY

(Non-Merits, Prevention of Spoliation Only)

Petitioner submits the following examples **not** to prove wrongdoing, accuracy, inaccuracy, or causation, and **not** to challenge any artist, platform, or chart. The purpose is narrower and strictly procedural: **to demonstrate that modern streaming and chart metrics behave as unstable, self-revising digital outputs whose meaning cannot be verified without the preservation of the underlying logs.**

A judge does not need to accept any number as true for this point to stand.

The *pattern* itself is the evidentiary risk.

### A. Surges in Long-Dormant Catalog Tracks Without External Triggers

Publicly posted analytics from November 15–16, 2025 showed:

- "Headlines," released over fourteen years ago, becoming the most-streamed rap track on U.S. Spotify.

- *Views* recording its largest daily streams in seven years, approaching all-time highs without any visible promotional or cultural event.

The Court is not asked to decide whether these surges were legitimate;

the only relevant fact is that **they occurred suddenly, at scale, and without any disclosed**

**external trigger**—meaning the interpretation of these movements depends entirely on internal, platform-controlled data that auto-overwrites.

**B. Repeated Spikes Within a Single Month, Absent Any Public Explanation**

Two independent posts from September 2025—separated by ten days—reported:

- ~810,000 daily streams

- then ~860,000 daily streams

   for a historically stable catalog song.

These jumps occurred:

- with no new marketing,

- no touring activity,

- no playlist placement, and

- no platform-announced algorithmic update.

This is not "suspicious."

It is **structurally unexplainable without preserved logs**, which is all Rule 27 requires.

## C. Multi-Track Movements Suggest Algorithmic Sensitivity

Across October–November 2025, several catalog tracks across the same artist's discography surged irregularly:

- "Headlines,"

- "Houstatlantavegas,"

- additional deep cuts,

    each reaching levels inconsistent with prior patterns.

Petitioner takes no position on why.

The only Rule 27 fact is this: **these movements cannot be verified, contextualized, or reconstructed without preserved metadata, ingestion files, and algorithmic histories.**

## D. Subscriber and View Metrics Display Step-Function Volatility

Public third-party analytics (June–July 2025) reflect:

- repeated, identical 100,000-subscriber jumps on fixed dates;

- discrete step-increases to ~31.1 million subscribers;

- irregular drops and rebounds in view totals.

Whether these reflect reporting cycles, algorithmic adjustments, or internal corrections is irrelevant to the Court.

Their significance is that **the internal records explaining these movements are not public and do not persist without preservation.**

### E. Chart Rules–Even When Publicly Mentioned—Are Not Publicly Explained

A July 2025 public post by a charting artist referenced "rule changes" affecting positions.

Petitioner does not interpret that statement.

Its relevance is procedural: **any rule change alters how inputs are counted**, meaning:

- methodology files,

- ingestion criteria,

- internal communications, and

- weighting logs

   must be preserved before overwriting erases them.

### F. The Evidentiary Logic (This Is the Part Judges Need Laid Out Cleanly)

To preempt misunderstanding, Petitioner clarifies:

1. **No allegation of misconduct is made.**

   The anomalies stand alone as evidence of system volatility.

2. **No causal inference is requested.**

   The Court need not determine why any spike occurred; only that spikes occurred and cannot be interpreted without preserved logs.

3. **Metrics are self-reported digital outputs, not independent facts.**

   Unlike human events—concerts, interviews, sales receipts—streaming metrics **exist only in the systems that generate them**.

4. **Synthetic activity (AI artists, algorithmic pushes, recommender surges) leaves no human-world footprint.**

   Once overwritten, no third-party evidence exists to rebuild the prior state.

5. **Rule 27 requires risk of loss—not proof of liability.**

   Every anomaly presented satisfies that standard.

**G. Why This Matters: The Metaphor the Court Will Understand**

Human-world events behave like footprints in sand:

even if a wave distorts them, witness testimony, physical traces, and surrounding context can reconstruct what happened.

Digital metrics behave like numbers on a calculator:

once you press "clear," nothing remains—not the prior number, not the calculation steps, not the inputs, not the sequence.

A streaming spike is a number.

Once overwritten, it is gone forever unless preserved now.

Rule 27 exists for this type of evidence.

## H. The Procedural Conclusion

These examples demonstrate one fact with legal significance:

**Without immediate preservation, the Court's future ability to determine what occurred will be permanently impaired, regardless of whether the underlying data reflects legitimate engagement or system-driven volatility.**

This section asserts nothing about motives, accuracy, or conduct.

It establishes only the evidentiary instability that **mandates preservation before suit**—the exact function Rule 27 was designed to serve.

---

## VI. STRUCTURAL ASYMMETRY: DOWNSTREAM LITIGATION, UPSTREAM SILENCE

Public records show that major artists routinely litigate disputes with labels, publishers, managers, merch entities, and other downstream actors. Yet the platforms that actually generate

the metrics defining commercial value — Spotify, Apple Music, YouTube, and others — remain almost entirely absent from such litigation. The absence of platform litigation does not imply the absence of issues; it reflects an ecosystem in which the most consequential data actors sit outside traditional accountability channels.

This asymmetry is legally relevant because it underscores why preservation must occur **before** the anticipated action is filed. If upstream entities are structurally insulated from ordinary litigation pressure, then the evidence they hold — evidence no one ever sues to obtain — risks disappearing unless this Court intervenes now.

---

## VII. INTERNATIONAL RECOGNITION OF AI-RELATED EVIDENTIARY RISK

On October 26–27, 2025, the Government of Australia released its national position on artificial intelligence and copyright. The report emphasized that AI-generated works and AI-training practices make provenance verification difficult, undermine traditional notions of authorship, and require heightened safeguards to maintain accountability. The government rejected a broad text-and-data-mining exception partly because it would further obscure how AI outputs are produced and altered over time.

Petitioner cites this not as foreign policy guidance, but as contemporaneous recognition by a national government that AI-driven datasets possess fundamentally different evidentiary properties than human-generated records. When synthetic and human inputs coexist in a single dataset, the record becomes dependent on internal logs and algorithmic states that auto-overwrite and cannot be reconstructed. The risk identified by Australia is the risk present here.

## VIII. CHARTS AS FINANCIAL INFRASTRUCTURE

Although charts appear to the public as cultural scoreboards, they function as economic instruments used to price catalog sales, structure securitized royalty products, justify acquisitions, negotiate sponsorships, and support investor communications. If the underlying metrics are drawn from unaudited, self-reported streaming numbers that may shift without notice or explanation, downstream financial products may be mispriced and public disclosures may omit material weaknesses.

Exhibit A shows that the reliability of chart metrics has been questioned since at least 2016, long before AI-driven instability. The point here is narrow: this Court's preservation order may directly affect whether financial representations built on chart data were complete, accurate, or materially misleading.

## IX. DAUBERT AND RULE 37(e) IMPLICATIONS

If the Court acknowledges that streaming counts are self-reported, charts are constructed from those unaudited numbers, and synthetic inputs now reshape the underlying datasets, then any expert opinion premised on chart performance or "record-breaking" streams faces a Daubert reliability problem. Expert testimony cannot rest on data with an unknown chain of custody or an overwritten evidentiary history.

Preservation now prevents future disputes grounded in missing or altered evidence and ensures that any expert opinions in the anticipated action rest on an intact factual record. Rule 37(e) reinforces the urgency: once Petitioner has identified the structural risk, the loss of raw logs or methodology files raises significant spoliation concerns. Early preservation avoids precisely that outcome.

---

## VIII. ANTITRUST AND REGULATORY CONTEXT (WITHOUT ASSERTING CLAIMS)

Exhibit A and the contemporary record describe a marketplace in which exclusive arrangements, vertically integrated data flows, and unaudited platform-reported metrics operate inside a consolidated ecosystem. The same entities that supply streaming data, transform that data into chart positions, and narrate those chart positions to the public often participate in shared financial structures. This alignment creates incentives to preserve the appearance of stability rather than the evidentiary history necessary to evaluate it.

These structural conditions implicate the same competitive concerns addressed in the Sherman Act, the Clayton Act, and Section 5 of the FTC Act, without requiring the Court to adjudicate any such claim at this stage. Exclusive promotion arrangements can alter visibility and algorithmic placement. Vertical integration between labels, platforms, and data intermediaries can restrict independent verification of market performance. And downstream financial products — including catalog securitizations, valuation models, and investor communications — rely on metric pipelines that are opaque, unaudited, and continuously rewritten.

Petitioner cites these principles not to pursue antitrust relief now, but to underscore why preservation is essential. Where the collection of data, the interpretation of that data, and the financial exploitation of that data sit within overlapping control, the risk of unintentional evidence loss is heightened by design. Independent preservation ensures that later courts and agencies will not be forced to rely on reconstructed narratives or degraded datasets when evaluating whether exclusivity, gatekeeping, or data asymmetry affected competition or consumer perception.

A preservation order protects the integrity of the eventual record, safeguards any regulatory or investor-facing inquiries that may follow, and prevents the evidentiary vacuum that would otherwise result from continued overwrite and migration. The purpose here is procedural: to ensure that the technical history of how chart and streaming inputs were generated, weighted, and operationalized remains available for whatever legal or administrative forum may later require it.

---

## IX. ANTICIPATED DEFENSES AND PREEMPTIVE RESPONSES

1. **"This is speculative."**

    It is not. Synthetic artists have already charted; AI and synthetic traffic have already produced federal prosecutions; platforms have already removed large volumes of AI tracks.

    Rule 27 requires **risk of loss**, not certainty of misconduct.

2. **"Preservation is burdensome."**

   If burdensome, the burden itself confirms system fragility, which favors Rule 27 relief.

   If not burdensome, then there is no prejudice. Either way, preservation is justified.

3. **"Respondents lack control over third-party data."**

   In this District, "control" includes any **practical ability** to obtain or influence data.

   Respondents receive, use, and rely upon chart and streaming datasets for commercial

   decisions. That suffices for control under *In re NTL*, *Zubulake*, and *Pension Committee*.

4. **"The evidence is stable."**

   If stable, preservation changes nothing and imposes minimal burden.

   If unstable, Rule 27's standard is satisfied.

   Either position logically supports preservation.

5. **"Synthetic artists are irrelevant to the anticipated action."**

   Synthetic inputs alter chart rankings, market share, royalty distributions, algorithmic

   weighting, and comparative baselines. These are central to the anticipated challenge to

   streaming-related metadata and comparative performance datasets. This goes to

   **materiality**, not merits.

6. **"This is policy, not procedure."**

   Petitioner seeks **no** industry redesign, no royalty systems, and no marketplace regulation.

   Petitioner seeks the **minimum procedural safeguard** required to ensure that the Court

can evaluate the evidence later.

7. **"This is premature."**

   Prematurity is the condition Rule 27 was designed to address.

   If the evidence were not at risk before suit, Rule 27 would serve no function.

---

## X. ANALOGY FOR JUDICIAL CLARITY

Human artists leave physical **footprints**; synthetic artists leave only **numbers**.

If sand erases footprints, surrounding evidence and testimony can still reconstruct them.

If numbers disappear, there is nothing to reconstruct.

Similarly, synthetic traffic and synthetic artists do not generate independent human records.

Their effect on charts and market perception can only be understood by preserving the

**underlying logs, weighting files, and methodology** before they are overwritten.

The Court is being asked only **to preserve the sand before the tide removes it.**

---

## XI. CLARIFYING THE SCOPE OF RELIEF

Petitioner expressly states:

- Petitioner is **not** asking this Court to design a royalty pool, create a new category of AI royalties, or regulate business models.

- Petitioner is **not** asking this Court to restructure the music industry, streaming platforms, or chart systems.

Any financial or structural remedy would be **premature** until the underlying evidence is preserved.

 Proposing a replacement system before the Court can examine the existing one would only guarantee that the same distortions are replicated under a different name.

The Court's role here is narrower and traditional:

**To ensure that evidence necessary for a future action is not destroyed, altered, or rendered unverifiable before the Court can evaluate it.**

Petitioner seeks no more than that.

---

## XII. FINAL EVIDENTIARY STATEMENT TO THE COURT

The following encapsulates the core evidentiary emergency:

Your Honor, this is not a cultural dispute about the role of AI in music. It is an evidentiary emergency. Synthetic artists charting today leave no human footprint—only machine-generated metrics. These metrics are continuously overwritten, mutated by algorithms, and irretrievable once altered. If preservation is denied, the evidence distinguishing human engagement from synthetic activity becomes permanently non-reconstructable. Rule 27 exists for this exact circumstance. Any objection to preservation implicitly concedes instability; and if instability exists, preservation is mandatory. Petitioner seeks no industry reform, no regulatory oversight, and no economic remedy—only the Court's minimal intervention to prevent the loss of evidence required for a future action. Without preservation, the marketplace becomes synthetic, the record becomes artificial, and the truth becomes unverifiable.

---

Petitioner respectfully requests that the Court enter an order providing the following narrowly tailored relief:

1. **Judicial Notice.**

   Take judicial notice of Exhibit A (the 2016 Stereogum article) and Exhibit B (public reports documenting synthetic-artist chart placements) under FRE 201, 401, 406, and 803(17) for the limited, contextual purposes described in this filing.

2. **Preservation of Electronic Evidence.**

Direct Respondents, and any third parties within their possession, custody, or control as that term is used in Rule 34, to preserve electronic evidence necessary to reconstruct historical chart inputs and weighting methodologies, including:

• platform-level streaming logs and engagement files;

• Luminate ingestion records, audit trails, and methodology documents;

• chart-calculation scripts, version histories, and weighting criteria;

• internal communications concerning chart rules, algorithmic adjustments, and the treatment of AI-generated or synthetic inputs.

The request is limited to evidence reasonably necessary to distinguish human-origin activity from synthetic or machine-generated activity and to maintain the integrity of the future record.

3. **Limited Discovery for Preservation Identification.**

Authorize discovery under Rule 27(a)(3), and modify Rule 26(d)(1) for this limited purpose only, to permit Petitioner to identify:

• relevant custodians;

• system locations, logs, and data structures;

• applicable retention schedules, overwrite functions, and migration policies; and

• the technical scope required to ensure adequate preservation.

This discovery shall be confined to preservation logistics and shall not compel production on the merits.

4. **Supplementary Authority.**

Issue any additional order deemed necessary under the Court's inherent authority and the All Writs Act to maintain the evidentiary status quo, including reference to Rule 37(e) spoliation principles as guidance for all custodians.

Courts in this District routinely grant preservation orders where electronic evidence is at risk of loss even absent allegations of misconduct.

*See In re NTL Sec. Litig.*, 244 F.R.D. 179 (S.D.N.Y. 2007); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003).

---

## EXHIBIT INDEX

### Submitted with the Final Emergency Supplemental Rule 27 Filing

### In re Petition of Joseph Anthony Reyna, Case No. 1:25-cv-06779

---

**Exhibit A – Stereogum Drake /** *Views* **Analysis (2016)**

**Article:** "Skewed VIEWS: The Huge Truth About Drake's Record-Breaking Chart Run"

**Publication:** Stereogum – August 5, 2016

**URL:**

https://stereogum.com/1892123/skewed-views-the-huge-truth-about-drakes-record-breaking-chart-run/columns/but-whos-buying

Submitted solely for judicial notice of existence and publication date, demonstrating contemporaneous industry recognition of chart-data vulnerability and reliance on unaudited, platform-reported streaming numbers.

"OK, moving on. When VIEWS was released, it set a new record: 245.1 million streams in the US alone -- that's vastly better than Bieber's total across all streaming services, and it absolutely squashes the scrubby 77 million that Purpose achieved on Spotify. Look again at the two pie charts above -- remember that Spotify has 100 million users and Apple Music has only 15 million -- and then look at this."



"Now that is SOMETHING! You don't see that every day, and if you look at statistics a lot -- especially when dealing with samples sizes this substantial -- you *never* see that. That's just not how big numbers move. If you work with statistics and you see something like that, your first thought is typically going to be that you've made a mistake. Maybe you entered an incorrect figure into one of the fields. You'd go back and check to make sure."

---

**Exhibit B – Documentation of Synthetic (AI-Generated) Artists Entering National Charts (2024–2025)**

**B-1 — "Breaking Rust" AI Country Artist (Billboard Country Digital Song Sales No. 1)**

**Billboard:** As AI Artists Breaking Rust & Cain Walker Rule a Country Chart, Nashville Execs Weigh in: 'It's Incredibly Detrimental'

**URL:**

https://www.billboard.com/pro/ai-artists-breaking-rust-country-music-chart-reactions/



---

**B-2 — Cain Walker (AI Country Artist)**

**Saving Country Music:** "AI Artists May Be On The Charts But They're Not That Popular - Yet"

**URL:** https://www.billboard.com/pro/ai-music-artists-charts-popular/



**B-3 — Xania Monet (AI R&B / Gospel Artist With Airplay & Chart Footprint)**

**Billboard:** AI Artist Xania Monet Debuts on Adult R&B Airplay - A Radio Chart Breakthrough

**URL:**

https://www.billboard.com/music/chart-beat/ai-artist-xania-monet-debut-adult-rb-airplay-chart-1236102665/



**Exhibit C – Government of Australia AI/Copyright Position (Oct. 26–27, 2025)**

Demonstrates contemporaneous governmental recognition that AI-origin datasets possess unstable provenance, unverifiable authorship, and heightened evidentiary risks.

**C-1 — News Summary of Government Decision**

**Complete Music Update:** "Australian government blocks potential AI copyright exception"

 **Date:** October 27, 2025

 **URL:**

https://completemusicupdate.com/australian-government-blocks-potential-ai-copyright-exception

/

---

**C-2 — Industry-Facing Explanation of the Decision**

**Employment Hero:** "AI Models Told To Keep Its Mitts Off Aussie Ideas As Govt Rejects Data Mining Exemption"

 **Date:** October 27, 2025

 **URL:**

 https://employmenthero.com/news/australian-government-rejects-ai-data-mining-exemption/

---

**C-3 — Official Government Submission (Policy Background: AI & IP Rights System)**

**Australian Government / Attorney-General's Department Submission – "Artificial Intelligence and the IP Rights System."**

IP Australia artificial intelligence transparency statement

 **Submission Publication Date:** October 26, 2025

**PDF Download:**

https://www.ipaustralia.gov.au/About-us/~/-/media/Project/IPA/IPAustralia/PDF/Accountability-and-reporting/AI-Transparency-Statement.pdf?rev=ef7285066be44b0aa44621cc945a2f74

---

**Exhibit D – Luminate / Billboard Methodology & System Sensitivity**

*(Data Provenance, Chart Processes, and Source Integrity)*

---

**D-1 — Luminate (formerly Nielsen SoundScan) Methodology & Data Pipeline**

**Purpose:** Establish how chart-eligible data (sales, streams, downloads, airplay) is ingested, verified, and supplied to Billboard.

**D-1(a) — Luminate — "Frequently Asked Questions" (Official)**

**URL:**

 https://luminatedata.com/faq/

**Relevance:**

Luminate identifies itself as the **industry-standard measurement platform** for music and the **data provider informing the Billboard charts.**

---

**D-1(b) — Luminate Knowledge Base — "Methodology FAQs: Our formulas, data sources and eligibility"**

**URL:**

https://support.luminatedata.com/portal/en/kb/articles/methodology-faqs

**Relevance:**

Contains Luminate's **own statement**:

"Luminate provides the data and the equivalent calculations used to create Billboard chart rankings."

This is the most direct pipeline admission available publicly.

---

**D-1(c) — Disc Makers (Industry Explanation) — "What Is Luminate?"**

**URL:**

https://support.discmakers.com/hc/en-us/articles/115016063707-What-is-Luminate

**Relevance:**

Explains in plain industry terms that Luminate:

- tracks **sales, streams, downloads, airplay**,

- aggregates music consumption data across digital and physical sources, and

- is the **data source for the Billboard charts**.

This functions as a third-party corroboration consistent with Luminate's own statements.

---

**D-2 — Billboard Chart Methodology / "How This Chart Works"**

*(Establishes how Luminate data becomes Billboard rankings)*

**D-2(a) — Billboard 200 (Live Chart Page + Methodology Statement)**

**URL:**

https://www.billboard.com/charts/billboard-200/

**Relevance:**

The Billboard 200 page contains Billboard's **current methodology statement** directly beneath

the **"Billboard 200™"** header:

> *"The week's most popular albums as compiled by Luminate, based on multi-metric*
>
> *consumption (blending traditional album sales, track equivalent albums (TEA), and*
>
> *streaming equivalent albums (SEA))."*

This functions as the modern equivalent of the historical **"How This Chart Works"** box. Billboard has removed the explicit label, but the methodology description remains and is essential for evidentiary preservation because:

- it defines the inputs sourced from Luminate,

- identifies the multi-metric formula (SEA + TEA + sales), and

- is subject to change or silent revision.

This page must be **screenshotted** because Billboard routinely modifies chart descriptions, display formats, and methodology phrasing without archival notice.

---

**D-2(b) — Billboard Pro — "How the Hot 100 and Billboard 200 Charts Work" (Expert-Level Methodology)**

**URL:**

https://www.billboard.com/pro/billboard-charts-how-they-work-on-the-record-podcast/

**Relevance:**

This Billboard Pro explainer provides a **detailed breakdown** of:

- the Billboard 200 and Hot 100 chart formulas,

- SEA (streaming-equivalent albums),

- TEA (track-equivalent albums),

- physical and digital sales integration,

- weighting distinctions between paid streams vs. ad-supported streams,

- rules governing catalog vs. current releases,

- bundling exclusions, and

- the central role of **Luminate as the data provider**.

This serves as the authoritative, industry-facing explanation of Billboard's computation methods and is used to contextualize how chart outcomes rely on Luminate's ingestion, verification, and weighting systems.

It is the "expert-level" methodology source confirming the **structural pipeline:**

**Luminate → Billboard → public chart rankings.**

---

**D-2(c) — Quoted Methodology (to attach directly in the exhibit)**

Data is collected and aggregated from multi-metric consumption including album sales, track-equivalent albums (TEA) and streaming-equivalent albums (SEA). The charts incorporate on-demand official audio and video streams, digital track sales, and physical album sales. To compile the charts, Billboard and its data partner evaluate the reported figures and apply chart rules including weighting of paid vs. ad-supported streams, exclusion of bundling when relevant, and adjustments for catalog classification and other special cases.

This is the anchor that ties Luminate inputs to Billboard outputs.

---

**Exhibit E — Structural Ownership / Vertical Integration Context**

**Hollywood Reporter / Billboard Media Group acquisition of SpinMedia music properties (SPIN, Vibe, Stereogum).**

**Los Angeles Times:** Coverage of Dec. 23, 2016 acquisition

**URL:**

https://www.latimes.com/business/la-fi-hollywood-reporter-spin-media-20161223-story.html

**Exhibit F – 2020 Email from Billboard Personnel Confirming Chart Category Communications**

Exhibit F is a 2020 email from Billboard personnel confirming the existence of internal chart-category determinations and direct communications of chart placements to artists, which is relevant to identifying custodians and datasets requiring preservation.



**A**    Alex Vitoulis   Sep 21, 2020

to me

| From | Alex Vitoulis   Alex.Vitoulis@billboard.com |
|------|---------------------------------------------|
| To | Chad Focus   iamchadfocus@gmail.com |
| Date | Sep 21, 2020 at 4:47 PM |
| 🔒 | Standard encryption (TLS)
Learn more |

Get To The Money charted on:


R&B/Hip-Hop Album Sales

Independent Albums

Heatseekers

Heatseekers East North Centrla

Rap Album Sales


Thank and stay safe

...

me   Sep 21, 2020

to Alex

Alex,

Do you know their highest charting positions?

**Exhibit G – Historical Non-Enforcement Even Where Full Evidence Was Seized**

In prior federal cases involving streaming manipulation, investigators seized complete hard drives, software tools, and transactional records documenting coordinated bot-driven play inflation.

Despite possessing definitive proof of structural vulnerabilities in the streaming-to-chart pipeline, no agency pursued broader audit mandates, industry-wide enforcement, or methodological review.

This shows a systemic gap: platform-generated streaming metrics can be manipulated, federal authorities know they can be manipulated, but no institution has the mandate or capacity to independently validate or preserve the underlying data.

---

**DECLARATION OF JOSEPH ANTHONY REYNA**

28 U.S.C. § 1746

I, **Joseph Anthony Reyna**, declare under penalty of perjury:

1.  I am the Petitioner in this matter.

2.  I anticipate filing an action challenging the accuracy, integrity, and provenance of streaming-related metadata, chart-ranking inputs, and comparative performance datasets.

3. Synthetic artists and synthetic traffic have entered national charts and industry metrics.

4. The evidence reflecting these phenomena is electronic, continuously overwritten, and irretrievable once altered.

5. Preservation is necessary to prevent irreversible loss of critical evidence, including the ability to distinguish human engagement from synthetic activity.

6. Exhibits A through E are true and correct copies of publicly available materials referenced in this filing. Where URLs are provided, Petitioner maintains preserved versions to cure any future link-rot or authenticity disputes.

7. Where URLs are provided, Petitioner will supply preserved copies in the event of future link-rot or dispute over authenticity.

Executed on November 16, 2025

Location: Austin, TX

**/s/ Joseph Anthony Reyna**

Petitioner

---

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

**Joseph Anthony Reyna (JOECAT®),**

Plaintiff,

v.

**Universal Music Group N.V.,**

Defendant.

Civil Action No. 1:25-cv-06779

---

**[PROPOSED ORDER]**

Upon consideration of Petitioner's Rule 27 Petition and Supplemental Submissions, and for good cause shown, it is hereby ORDERED:

1. **Preservation of Evidence**

   All electronically stored information described in the Petition and Supplemental Filings shall be preserved pending the anticipated action.

2. **Suspension of Destruction or Alteration**

   Respondents and any third parties within their possession, custody, or control shall suspend deletion, overwriting, migration, or alteration of chart-related datasets, including

data reasonably necessary to reconstruct historical streaming activity, chart-ranking inputs, and methodology-related information.

3. **Limited Discovery for Preservation Identification**

   Pursuant to Rule 27(a)(3), Petitioner is authorized to conduct limited discovery solely to identify custodians, systems, data locations, retention schedules, and technical structures necessary to implement effective preservation.

    Rule 26(d)(1) is modified for this limited purpose only.

4. **No Merits Discovery**

   This Order compels no discovery on the merits. Its scope is confined to preservation.

5. **Spoliation Notice**

   All parties and custodians are advised that the loss of electronically stored information relevant to the anticipated action may implicate Fed. R. Civ. P. 37(e).

SO ORDERED.

Dated: _____, 2025

 New York, New York

_____

Hon. Laura Taylor Swain

United States District Judge

_____

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

**Joseph Anthony Reyna (JOECAT®),**

Plaintiff,

v.

**Universal Music Group N.V.,**

Defendant.

Civil Action No. 1:25-cv-06779

---

**[PROPOSED PRESERVATION ORDER]**

Upon review of Petitioner's Rule 27 filings demonstrating the volatility, overwrite risk, and structural sensitivity of chart-related datasets, the Court enters the following supplemental preservation measures to ensure that critical evidence is not lost, altered, or degraded before the anticipated action is filed:

1. **Preservation of All Pre-Processed, Intermediate, and Final Datasets**
   Respondents shall preserve all data layers reasonably necessary to reconstruct historical chart behavior, including:

   a. ingestion logs;

b. pre-filtered datasets;

c. anomaly-flagged entries;

d. weighting models;

e. TEA/SEA conversion logic;

f. rule-version history; and

g. any chart-eligibility determinations.

This includes all versions, drafts, and prior iterations retained in active servers, backup systems, cloud mirrors, or distributed architectures.

2. **Retention of Overwrite Schedules and System Metadata**

Respondents shall preserve:

a. data lifecycle rules;

b. automated deletion timers;

c. cloud-region replication settings;

d. S3 lifecycle and TTL rules;

e. system logs detailing when and how information would otherwise be overwritten.

These materials are necessary to ensure the Court can evaluate the feasibility and completeness of preservation efforts.

3. **Preservation of Synthetic-Detection Layers and AI-Classification Outputs**

Respondents shall preserve all files, logs, or detection systems used to classify or distinguish synthetic, automated, artificial, or non-human streaming activity, regardless of

whether such classifications were used for chart eligibility.

4. **Preservation of Chart-Rule Versioning and Historical Rule Sets**

   Respondents shall preserve all historical versions of:

   a. Billboard chart rules;

   b. Luminate weighting methodologies;

   c. algorithmic criteria;

   d. catalog vs. current classification logic;

   e. adjustments applied retroactively or prospectively.

5. **Identification of Custodians for Preservation Implementation**

   Pursuant to Rule 27(a)(3), Respondents shall identify custodians responsible for:

   a. ingestion pipelines;

   b. data engineering;

   c. chart methodology;

   d. internal audit systems;

   e. fraud-review or anomaly-detection teams;

   f. archival and retention operations.

   This identification is necessary to implement effective preservation and does not constitute merits discovery.

6. **No Production Required on the Merits**

   This Order is limited to identification and preservation.

No substantive data production is compelled at this stage.

7. **Scope of Control Under Rule 34**

   For preservation purposes, "possession, custody, or control" includes:

   a. affiliates;

   b. third-party vendors;

   c. cloud-service providers;

   d. mirrored servers in foreign jurisdictions;

   e. any entity maintaining data for or on behalf of Respondents.

8. **Spoliation Warning**

   Parties are advised that any failure to preserve the above categories may trigger the remedial provisions of Fed. R. Civ. P. 37(e), including:

   a. adverse inference;

   b. evidentiary preclusion;

   c. monetary sanctions; or

   d. any relief the Court deems appropriate.

SO ORDERED.

Dated: _____, 2025

New York, New York

_____

Hon. Laura Taylor Swain

United States District Judge

_____

**CERTIFICATE OF SERVICE**

I certify that on **November 17, 2025**, I served the foregoing **Final Emergency Supplemental Rule 27 Filing** by **United States Postal Service Nonprofit Mail**, with USPS tracking numbers retained and independently verifiable through USPS delivery-record systems.

Service was completed as follows:

**1. Registered Agent Service**

**The Corporation Trust Company**

Corporation Trust Center

1209 Orange Street

Wilmington, Delaware 19801

Served via USPS Nonprofit Mail.

**2. Courtesy Physical Copies to Universal Music Group Legal / Compliance Contacts**

Each recipient received a separately addressed envelope sent via USPS Nonprofit Mail, with tracking retained.
 Each printed notice included the corresponding internal email address for identification.

- legal@umusic.com

- privacy@umusic.com

- communications@umusic.com

- copyright@umusic.com

I certify under penalty of perjury that the foregoing is true and correct.

Executed on **November 17, 2025**, in **Austin, Texas**.

/s/ **Joseph Anthony Reyna**

**Joseph Anthony Reyna (JOECAT®)**

Plaintiff / Pro Se

5900 Balcones Dr., Suite 16077

Austin, Texas 78731

Email: whitehat@joecattt.com